**No. 26-246**

# United States Court of Appeals for the Ninth Circuit

JOANNE BOGARD; ANNIE MCGRATH; JANE DOE;
BECCA SCHMILL FOUNDATION

*Plaintiffs-Appellants,*

– v. –

ALPHABET INC.; XXVI HOLDINGS INC; GOOGLE LLC; YOUTUBE, LLC;
BYTEDANCE, INC.; TIKTOK INC.,

*Defendants-Appellees.*

ON APPEAL FROM A DECISION OF THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
NO. 5:24-CV-03131-VKD · HONORABLE VIRGINIA K. DEMARCHI

## APPELLANTS' OPENING BRIEF

PATRICK K. LIN
ANDREW FRIEDMAN
PRISCA SIELAFF
WASHINGTON SQUARE LEGAL SERVICES, INC.
New York University School of Law
245 Sullivan Street, 5th Floor
New York, New York 10012
(212) 998-6430
pkl236@nyu.edu

JUYOUN HAN
EISENBERG & BAUM, LLP
24 Union Square East, Penthouse
New York, New York 10003
(917) 935-0251
jhan@eandblaw.com

*Attorneys for Plaintiffs-Appellants*

COUNSEL PRESS (800) 4-APPEAL • (392386)

# TABLE OF CONTENTS

INTRODUCTION ........ 1

JURISDICTIONAL STATEMENT ........ 3

STATEMENT OF THE CASE ........ 4

PROCEDURAL HISTORY ........ 8

STATEMENT OF THE ISSUES ........ 9

STANDARD OF REVIEW ........ 9

SUMMARY OF ARGUMENTS ........ 10

ARGUMENTS ........ 12

A. The Lower Court Erred in Concluding that the Becca Schmill Foundation Lacked Standing ........ 12

B. The District Court Erroneously Decided that Section 230 Bars Plaintiffs-Appellants' Claims ........ 16

C. Appellants' Common Law Claims Were Appropriately Pleaded ........ 22

1. District Court Erred in Dismissing Common Law Products Liability Claims (Claim 1) ........ 22

2. District Court Erred in Dismissing Negligence (Claim 2) ........ 32

3. District Court Erred in Dismissing Misrepresentation Claims (Claims 3& 4) ........ 37

4. District Court Erred in Dismissing State Statutory Claims (Claims 5 – 8) ........ 45

D. The District Court Erred in Finding that the First Amendment Bars Certain Claims ........ 60

CONCLUSION ........ 63

# TABLE OF AUTHORITIES

## Cases

*A.M. v. Omegle.com, LLC*,
614 F. Supp. 3d 814 (D. Or. 2022) .......... 23

*Ameer v. Lyft, Inc.*,
No. ED 112455, 2025 WL 679373 (Mo. Ct. App. 2025) .......... 23

*Barnes v. Yahoo!, Inc.*,
570 F.3d 1096 (9th Cir. 2009) .......... 16

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 53

*Blitz v. Monsanto Co.*,
317 F. Supp. 3d 1042 (W.D. Wis. 2018) .......... 51, 52

*Bohr v. Tillamook*,
373 Or. 343 (2025) .......... 55-56

*Bride v. Yolo Techs., Inc.*,
112 F.4th 1168 (9th Cir. 2024) .......... 17

*Brookes v. Lyft, Inc*,
2022 WL 19799628 (Fla. Cir. Ct. Sep. 30, 2022) .......... 23

*Brown v. Google LLC*,
No. 20-cv-03664-LHK, 2021 WL 6064009 (N.D. Cal. Dec. 22, 2021) .......... 59, 60

*Brownlee v. Vang*,
235 Cal. App. 2d 465 (1965) .......... 44

*Bunch v. Hoffinger Indus., Inc.*,
123 Cal. App. 4th 1278 (2004) .......... 32

*Calhoun v. Google LLC*,
526 F. Supp. 3d 605 (N.D. Cal. 2021) .......... 58

*Calise v. Meta Platforms, Inc.*,
103 F.4th 732 (9th Cir. 2024) .......... 17

*Captain & Co. v. Stenberg*,
505 N.E.2d 88 (Ind. Ct. App. 1987) .......... 47

*Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*,
447 U.S. 557 (1980) .......... 62

*Curtis v. Irwin Indus., Inc.*,
913 F.3d 1146 (9th Cir. 2019) .......................................................................9

*Denson v. Ron Tonkin Gran Turismo, Inc.*,
279 Ore. 85 (1977).......................................................................................54

*Doe 1 v. Twitter Inc.*,
148 F.4th 635 (9th Cir. 2025). ........................................................... 19, 33

*Doe v. Grinder*,
128 F.4th 1148 (9th Cir. 2025) ....................................................................20

*Doe v. Internet Brands*,
824 F.3d 846 (9th Cir. 2016) ......................................................... 16, 20

*Doe v. Lyft*,
No. 23-2548-JWB-TJJ, 2024 WL 4651015 (D. Kan. Nov. 1, 2024) ...................23

*Durell v. Sharp Healthcare*,
183 Cal. App. 4th 1350 (2010) .....................................................................43

*East Bay Sanctuary Covenant v. Biden*,
993 F.3d 640 (9th Cir. 2021) .......................................................................15

*Engalla v. Permanente Med. Grp., Inc.*,
15 Cal. 4th 951 (1997) ...............................................................................43

*Escola v. Coca Cola Bottling Co. of Fresno*,
24 Cal. 2d 453 (1944) ........................................................................ 26, 27

*Food & Drug Admin. v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) ................................................................... 13, 14, 15

*Garcia v. Character Techs., Inc.*,
No. 6:24-cv-1903-ACC-UAM, slip op. 36 (M.D. Fla. May 21, 2025) ................23

*Gonzales v. Nat. Factors Nutritional Prods. Inc.*,
No. 2:24-CV-02584-DSF-AS,
2024 WL 4609853 (C.D. Cal. June 28, 2024).....................................................43

*Greenley v. Kochava, Inc.*,
684 F. Supp. 3d 1024 (S.D. Cal. 2023) .........................................................57

*Greenman v. Yuba Power Prods., Inc.*,
59 Cal. 2d 60 (1963) .....................................................................................27

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982) .................................................................... 12, 14

*Himes v. Somatics*, LLC,
16 Cal. 5th 209 (2024) .................................................................................31

*HomeAway.com, Inc. v. City of Santa Monica*,
918 F.3d 676 (9th Cir. 2019) ............................................................ 17, 20, 22

*Hoosier Contractors, LLC v. Gardner*,
212 N.E.3d 1234 (Ind. 2023) .........................................................................48

*Horizon Bank v. Huizar*,
178 N.E.3d 326 (Ind. Ct. App. 2021) ............................................................47

*Hughes v. Apple, Inc*,
723 F. Supp. 3d 693 (N.D. Cal. 2024) ............................................ 24, 25, 28, 33

*Ill. ex rel. Madigan v. Telemarketing Assocs., Inc.*,
538 U.S. 600 (2003) ......................................................................................62

*Indianapolis-Marion Cty. Pub. Libr. v. Charlier Clark & Linard, P.C.*,
929 N.E.2d 722 (Ind. 2010) ...........................................................................48

*In re Adobe Sys., Inc. Privacy Litig.*,
66 F. Supp. 3d 1197 (N.D. Cal. 2014) ...........................................................48

*In re Anthem, Inc. Data Breach Litig.*,
No. 15-MD-02617-LHK, 2016 WL 3029783 (N.D. Cal. May 27, 2016) ............59

*In re Experian Data Breach Litig.*,
No. SACV 15-1592 AG (DFMX),
2016 WL 7973595 (C.D. Cal. Dec. 29, 2016) ..................................................59

*In re Facebook, Inc. Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020) ..........................................................................56

*In re Google Assistant Priv. Litig.*,
546 F. Supp. 3d 945 (N.D. Cal. 2021) ............................................................58

*In re Marriott Intl., Inc., Customer Data Sec. Breach Litig.*,
440 F. Supp. 3d 447 (D. Md. 2020) .......................................... 49, 50, 58, 59

*In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*,
702 F. Supp. 3d 809 (N.D. Cal. 2023) ....................................................... *passim*

*In re Solara Med. Supplies, LLC Customer Data Sec. Breach Litig.*,
613 F. Supp. 3d 1284 (S.D. Cal. 2020) ............................................................57

*In re TikTok, Inc., Minor Priv. Litig.*,
No. MDL 3144-GW-RAOX,
2025 WL 3628598, (C.D. Cal. Nov. 5, 2025) ....................................... 58, 59, 60

*In re Uber Techs., Inc., Passenger Sexual Assault Litig.*,
745 F. Supp. 3d 869 (N.D. Cal. 2024)................................................... 23, 24, 25

*Indianapolis-Marion Cty. Pub. Libr. v. Charlier Clark & Linard, P.C.*,
929 N.E.2d 722 (Ind. 2010)..................................................................................48

*Irwin v. Jimmy John's Franchise, LLC*,
175 F. Supp. 3d 1064 (C.D. Ill. 2016).................................................................49

*K & S Tool & Die Corp. v. Perfection Mach. Sales, Inc.*,
301 Wis. 2d 109 (2007) ................................................................................ 51, 53

*Kwikset Corp. v. Superior Ct.*,
51 Cal. 4th 310 (Cal. 2011) .................................................................................57

*Lemmon v. Snap, Inc.*,
995 F.3d 1085 (9th Cir. 2021)........................................................................ 19, 33

*Lopez v. Smith*,
203 F.3d 1122 (9th Cir. 2000)..............................................................................15

*McHenry v. Asylum Ent. Delaware, LLC*,
46 Cal. App. 5th 486 (2020)................................................................................36

*Neville v. Snap, Inc.*,
No. 22STCV33500 (Cal. Sup. Oct. 18, 2023)......................................................26

*Novell v. Migliaccio*,
2008 WI 44 (2008) ....................................................................................... 51, 52

*OCM Principal Opportunities Fund, L.P. v. CIBC World Mkts Corp.*,
157 Cal. App. 4th 835 (2007)..............................................................................45

*Opperman v. Path, Inc.*,
87 F. Supp. 3d 1018 (N.D. Cal. 2014)..................................................................22

*Pearson v. Philip Morris, Inc.*,
358 Or. 88 (Or. 2015) ..........................................................................................56

*Providence Health & Servs.-Oregon v. Mancuso*,
323 Ore. App. 573 (2023)....................................................................54

*Rowe v. Educ. Credit Mgmt. Corp.*,
559 F.3d 1028 (9th Cir. 2009)..............................................................9

*Rutherford v. Owens-Illinois, Inc.*,
16 Cal. 4th 953 (1997)........................................................................32

*Shea v. GM LLC*,
567 F. Supp. 3d 1011 (N.D. Ind. 2021)................................................46

*Snap, Inc. v. Eighth Judicial District Court in & for County of Clark*,
584 P.3d 771 (Nev. 2026)....................................................................61

*Social Media Cases*,
No. 22STCV21355, 2023 WL 6847378 (Cal. App. Ct. Oct. 13, 2023)........ 21, 32

*Spacesaver Corp. v. Marvel Grp., Inc.*,
621 F. Supp. 2d 659 (W.D. Wis. 2009)............................................ 50, 51

*State ex rel. Rosenblum v. Johnson & Johnson*,
275 Or. App. 23 (2015) ...................................................................... 54, 55

*State v. TikTok Inc.*,
245 N.E.3d (Ind. Ct. App. 2024) ................................................... *passim*

*T.V. v. Grindr, LLC*,
No. 3:22-CV-864-MMH-PDB,
2024 WL 4128796 (M.D. Fla. Aug. 13, 2024).......................................23

*TikTok, Inc. v. Eighth Jud. Dist. Ct. in & for Cnty. of Clark*,
578 P.3d 640 (Sup. Ct. Nevada 2025).............................................. 39, 40

*Uzuegbunam v. Preczewski*,
592 U.S. 279 (2021) ...........................................................................15

*Valle del Sol Inc. v. Whiting*,
732 F.3d 1006 (9th Cir. 2013)......................................................... 12, 15

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council*,
425 U.S. 748 (1976) ...........................................................................62

*Whiteley v. Philip Morris Inc.*,
117 Cal. App. 4th 635 (2004)........................................................... 43, 44

*Williams v. State of California*,
34 Cal. 3d 18 (1983) .......... 35

*Winter v. G.P. Putnam's Sons*,
938 F.2d 1033 (9th Cir. 1991) .......... 25

*Zauderer v. Office of Disciplinary Counsel*,
471 U.S. 626 (1985) .......... 63

**Statutes**

U.S. Const. amend. I .......... 3, 10, 62, 63

28 U.S.C. § 1291 .......... 3

California Business and Professions Code § 17200 .......... 10, 57

California Business and Professions Code § 17500 .......... 10 57

Fed. R. App. P. 4(a)(1)(A) .......... 3

Fed. R. Civ. P. 12(b)(6) .......... 9

Ind. Code Ann. § 24-5-0.5-3(b)(1) .......... 45

Ind. Code Ann. § 24-5-0.5-4(a) .......... 47

Ind. Code Ann. § 24-5-05-1 .......... 45

Or. Rev. Stat. Ann. 646.605–.656 (West) .......... 54

ORS § 646.638(1). .......... 54

Wis. Stat. Ann. § 100.18 (West) .......... 50

Wis. Stat. Ann. § 100.18(1) .......... 50

Wis. Stat. Ann. § 100.18(11)(b) .......... 50

Wis. Stat. Ann. § 100.18(11)(b)2 .......... 50

**Other Authorities**

*Actual Damages*, Black's Law Dictionary (11th ed. 2019) .......... 48

*Data Privacy in Bankruptcy: The Consumer Privacy Ombudsman*, 138 Harv. L. Rev. 1451 (2025), https://harvardlawreview.org/print/vol-138/data-privacy-in-bankruptcy-the-consumer-privacy-ombudsman ...........49

*Loss-of-Bargain Rule*, Black's Law Dictionary (12th ed. 2024)............................48

*Mislead*, Black's Law Dictionary (10th ed. 2014) ................................................52

*Order Sustaining in Part and Overruling in Part Defendant's Demurrer to Pls' 2d Amend. Compl*. 27–28, *Neville v. Snap, Inc.*, No. 22STCV33500 (Cal. Sup. Oct. 18, 2023)...................................................26

Restatement (Second) of Torts § 402(a) (A.L.I. 1965)..........................................23

Restatement (Second) of Torts § 546, cmt. b ........................................................43

Restatement (Third) of Torts § 19(a) (A.L.I. 1998) ..............................................23

Restatement (Third) of Torts: Products Liability § 19, cmt. A ..............................26

Tyrone Stewart, *TikTok Launches Fun Online Safety Video Series*, Mobile Marketing (Feb. 27, 2019) ....................................................................27

Witkin, Summary of California Law, Torts § 961 (11th ed. 2025).........................34

# I. INTRODUCTION

This appeal arises from the District Court's dismissal of eight claims brought by parents of victims of social media harms and the Becca Schmill Foundation, a non-profit organization that works to advocate for children's safety online, against YouTube and TikTok. Plaintiffs-Appellants alleged that Defendants-Appellees designed, deployed, and actively marketed defective reporting tools and invited users to report harms—and made systematic misrepresentations about those tools—causing harm to reporting users.

When Plaintiffs-Appellants Joann Bogard and Annie McGrath lost their children to choking challenge content on Defendants-Appellees' platforms, and when Jane Doe's child suffered from being exposed to sexually explicit and exploitative content involving minors, these parents turned to the reporting tools Defendants-Appellees had designed and represented as the safety tools for addressing that harm. They used the reporting tools exactly as instructed, submitted reports through official interfaces, and received automated responses finding no violation, or no response at all. In several cases, Defendants-Appellees later acknowledged—only after press scrutiny and external intervention—that the same reported content did, in fact, violate their own policies. This case is not about third-

party content. It is about what Defendants-Appellees promised, and what they failed to deliver.

In District Court, Plaintiffs-Appellants brought claims under products liability laws and misrepresentation under common law and state consumer protection laws. The District Court dismissed all claims, and in doing so committed a consequential error: it asked what content appeared on the platform when it should have asked how Defendants-Appellees designed the tools meant to address it, and how they represented those tools to the public. Because Plaintiffs-Appellants referenced harmful videos to demonstrate the reporting tools' failure rates, the District Court erroneously reasoned that their challenge must be directed at moderation outcomes. That logic inverts the pleading. The harmful contents were the measuring stick—evidence of the tools' systemic dysfunction—not the target of the claims in this case.

The District Court further erred by conflating two fundamentally different categories of harm. Plaintiffs-Appellants do not allege injury from the substance or ideas within the videos they reported; they were not at risk of imitating a choking challenge or purchasing illegal drugs. Their injury is categorically distinct: the defective reporting tools subjected them to friction, confusion, retraumatization, lost time, and futility as they attempted to make the platforms safer for children. That injury flows from a product defect and a misrepresentation—not from any third-party publication decision.

The District Court erred by holding that Section 230 and the First Amendment shield Defendants-Appellees from these claims. Section 230 immunizes platforms for editorial decisions regarding third-party content; it does not immunize manufacturers for the design of their own defective products or the falsity of their own affirmative representations. The First Amendment protects expression and editorial judgment; it does not protect deceptive conduct or negligent engineering. Plaintiffs-Appellants' claims are content-agnostic—they target how the reporting tools were built and what Defendants-Appellees said about them, not what any user posted and how they should be moderated.

This Court should reverse the District Court's dismissal and hold that Plaintiffs-Appellants have adequately pleaded claims, and remand the case for further proceedings.

## I. JURISDICTIONAL STATEMENT

This Court has jurisdiction under 28 U.S.C. § 1291 as an appeal from a final decision of the District Court dismissing all claims without leave to amend dated December 15, 2025. ER-4. Plaintiffs-Appellants timely appealed on January 12, 2026. ER-243; Fed. R. App. P. 4(a)(1)(A).

## II. STATEMENT OF THE CASE

Plaintiffs-Appellants are parents and advocates who used Defendants-Appellees' platforms and reporting tools to flag dangerous and illegal content—choking challenge videos, sexual exploitation of minors, and other material that Defendants-Appellees' Community Guidelines expressly prohibit. *See* ER-154-55 (AC ¶¶ 1–7). Plaintiffs-Appellants Joann Bogard and Annie McGrath are mothers whose children died after exposure to choking challenge content on Defendants-Appellees' platforms. ER-169-74 (AC ¶¶61–84). Plaintiff-Apellee Jane Doe reported sexually explicit and exploitative content involving minors. ER-175-77 (AC ¶¶88–102). Plaintiffs-Appellant The Becca Schmill Foundation is a non-profit dedicated to protecting children from online harm. ER-178 (AC ¶¶ 103–109).

Defendants-Appellees are TikTok Inc. and ByteDance Inc. ("TikTok") and Google LLC and YouTube LLC ("YouTube"), which design, operate, and control their respective platforms and the reporting tools at issue. ER-166-67 ¶¶ 46–49.

Both platforms built reporting tools for users into their interfaces and actively encouraged users to report content that violates the platforms' own Policies and Guidelines. ER-158-59, 169-70 (AC ¶¶ 18–21, 65–73). Through platform interfaces, help pages, safety campaigns, and congressional testimony, Defendants-Appellees represented that: dangerous challenges, self-harm behavior, illegal drug sales, child sexual exploitation, and similar content were prohibited ER-159, 174, 185 (AC ¶¶

19, 83, 133–134); users should report such content through Defendants-Appellees' tools ER-171, 180 (AC ¶¶ 68, 112–113); and reported content would be reviewed and removed when it violated platform Policies and Guidelines ER-40, 171, 180-81 (AC ¶¶ 19, 65, 68, 112–119).

During the relevant period, TikTok's and YouTube's reporting systems shared several core design features:

- *Account Gated Access*: Users were required to create and log into platform accounts to submit reports, even though videos could be viewed without an account. ER-171, 180.
- *Convoluted Interfaces*: On TikTok, the reporting function was buried within non-intuitive menus. ER-40, 171, 180-81 (AC ¶¶ 73, 113). On YouTube, reporting required navigating forms with limited and confusing category options. ER-170, 184 (AC ¶¶ 67, 126).
- *Automated Review and Response*: Reports processed through automated tools developed and used by respective platforms that generated canned responses indicating whether content violated Community Guidelines. ER-155, 167, 161, 186-87 (AC ¶¶ 8, 14–15, 21, 136, 140).
- *No Meaningful Appeal or Follow-Up Mechanism*: Users making reports could not meaningfully appeal determinations, obtain explanations for those

determinations, or even track reviews. ER-170, 181, 184 (AC ¶¶ 67, 118, 126–127).

Plaintiffs-Appellants alleged that these design choices resulted in systems that accepted reports but were incapable of reliably reviewing them against Defendants-Appellees' stated standards. ER-155-56, 192; *see also* ER-49-54 (AC ¶¶ 9, 11, 15, 164; *see also* Dkt. 127 at 2–7).

Each Plaintiff-Appellant used Defendants-Appellees' reporting tools exactly as instructed, relying on Defendants-Appellees' promises to review and respond to the reports. Plaintiffs-Appellants Bogard and McGrath repeatedly reported choking challenge videos. ER-169-72, 173-74 (AC ¶¶ 63–75, 81–84). Plaintiff-Appellant Jane Doe reported sexually explicit content involving minors. ER-175-77 (AC ¶¶ 88–102).

In many instances, Plaintiffs-Appellants reported content that squarely fell within Defendants-Appellees' own prohibited categories ER-159, 174, 185 (AC ¶¶ 19, 83, 133–134), submitted through official reporting interfaces ER-167-77 (AC ¶¶ 61–102), and received automated responses finding no violation—or no response at all ER-155, 160, 171, 174-76 (AC ¶¶ 9–11, 21, 71–72, 84, 90–99). Almost none of the reported videos were deemed violative, despite their obvious inconsistency with Defendants-Appellees' own policies. ER-155, 157, 161, 186-87 (AC ¶¶ 8, 14–15, 21, 136, 140). Yet, in some instances, Defendants-Appellees later acknowledged—

only after press or external intervention—that the same content did violate their policies, confirming the reporting tools' prior responses were wrong. ER-161, 186 (AC ¶¶ 24, 138); *see also* ER-51-52.

The Becca Schmill Foundation's structured research study independently corroborated the reporting tools' failures. ER-178-79, 186-87 (AC ¶¶ 103–109, 137–140). The Foundation systematically reported clearly violative choking challenge content and illegal drug sales through Defendants-Appellees' official channels and found that less than 5% of the videos were deemed violative. *Id*. The study confirms what Plaintiffs-Appellants experienced firsthand: systemic failure of Defendants-Appellees' reporting tools and falsity of Defendants-Appellees' representations regarding the same. *Id.*

Plaintiffs-Appellants seek injunctive relief requiring Defendants-Appellees to cease operating defective reporting tools and making misrepresentations about them, as well as damages for resulting harms. ER-155-56 (AC ¶¶ 9–11). Those harms include emotional distress and retraumatization from viewing harmful content in order to report it ER-56, 162, 172 (AC ¶¶ 10–11, 28, 74), frustration, confusion, and helplessness from the futility of that effort ER-155-56 (AC ¶¶ 9–11), physical manifestations of stress and anxiety ER-163, 172, 174 (AC ¶¶ 33, 74–75, 86), lost time and income ER-174, 201-202 (AC ¶¶ 86–87, 224, 233), and, for the Foundation, diverted resources and frustrated advocacy efforts ER-178-79 (AC ¶¶ 104–109).

Plaintiffs-Appellants would not have suffered these harms had Defendants-Appellees not represented that the reporting tools worked as promised. ER-155-56 (AC ¶¶ 9, 11, 40); ER-89-90.

## III. PROCEDURAL HISTORY

Plaintiffs-Appellants Joann Bogard, Annie McGrath, Jane Doe, and the Becca Schmill Foundation ("Foundation") (collectively, "Plaintiffs-Appellants") brought this action against Defendants-Appellees Google LLC and YouTube LLC (together, "YouTube"), and TikTok Inc. and ByteDance Inc. (together, "TikTok") (collectively, "Defendants-Appellees") in the District Court in the Northern District of California. On February 24, 2025, the District Court granted Defendants-Appellees' motion to dismiss all claims in the original complaint, with leave to amend. ER-208. On March 24, 2025, Plaintiffs-Appellants filed an Amended Complaint. ER-153. Defendants-Appellees renewed their motion to dismiss. ER-114. On December 15, 2025, the District Court granted Defendants-Appellees' motion to dismiss all the claims in the Amended Complaint without leave to amend. ER-5. Plaintiffs-Appellants timely filed a notice of appeal on January 12, 2026. ER-243. On February 6, 2026, this Court granted Appellants' Motion to Amend Case Caption and Motion to Extend Time to File Brief.

## IV. STATEMENT OF THE ISSUES

Whether Section 230 of the Communications Decency Act allows Plaintiffs-Appellants to bring claims under common law strict products liability, negligence, misrepresentation, as well as various state consumer protection laws.

Whether Plaintiffs-Appellants adequately pleaded facts regarding Defendants-Appellees' allegedly defective reporting tools and stated products liability claims.

Whether Plaintiffs-Appellants adequately pleaded facts regarding causation, reliance, and harms regarding the Defendants-Appellees' allegedly defective reporting tools.

## V. STANDARD OF REVIEW

The standard of review over a district court's motion to dismiss complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure is reviewed de novo. *See Curtis v. Irwin Indus., Inc.*, 913 F.3d 1146, 1151 (9th Cir. 2019). In reviewing the dismissal of a complaint, this Court accepts "all factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Rowe v. Educ. Credit Mgmt. Corp.*, 559 F.3d 1028, 1029–30 (9th Cir. 2009) (internal quotation marks omitted).

## VI. SUMMARY OF ARGUMENTS

Plaintiffs-Appellants bring eight claims arising from Defendants-Appellees' conduct. They allege strict products liability against all Defendants-Appellees (Count I); negligence against all Defendants-Appellees (Count II); fraudulent misrepresentation against all Defendants-Appellees (Count III); and negligent misrepresentation against all Defendants-Appellees (Count IV). Ms. Bogard asserts violations of the Indiana Deceptive Consumer Sales Act (Count V); Ms. McGrath asserts violations of the Wisconsin Deceptive Trade Practices Act (Count VI); Ms. Doe asserts violations of the Oregon Unlawful Trade Practices Act (Count VII); and Ms. Bogard, Ms. McGrath, Ms. Doe, and the Foundation assert violations of the California Business and Professions Code §§ 17200 and 17500 (Count VIII). Plaintiffs-Appellants seek compensatory and punitive damages, declaratory and injunctive relief, attorneys' fees, and costs. ER-167-68 (AC ¶¶ 52–54).

In addition to addressing the District Court's dismissal of each claim legal, Plaintiffs-Appellants first argue that their claims are not barred by Section 230 because they target Defendants-Appellees' own content-agnostic product design choices and misrepresentations about their reporting tools, rather than any publication decision regarding third-party content. Plaintiffs-Appellants also contend that the First Amendment provides no immunity because the claims regulate

deceptive conduct and negligent product design, not protected expression or editorial judgment.

The District Court's error is simple but consequential: it asked *what* appeared on the platform when it should have asked *how* Defendants-Appellees developed their safety tools and represented them to users.

The District Court cannot see past third-party content to reach the content-agnostic defect and misrepresentation claims targeting the reporting tools. It reasoned that because Plaintiffs- Appellants referenced harmful videos—choking challenges, illicit drug sales, and sexually explicit materials involving minors —their challenge must be to moderation outcomes. That logic inverts the pleading. Plaintiffs-Appellants reference the harmful content to demonstrate that the reporting tools failed and Defendants-Appellees' representations were false: accuracy rates below five percent, arbitrary outputs, and rampant false positives. The pervasiveness of harmful content was the measuring stick, not the target.

The District Court also collapsed two fundamentally different harms. Plaintiffs-Appellants do not allege injury from the ideas within the harmful videos, as they were not at risk of attempting a choking challenge or buying drugs online. Plaintiffs-Appellants' injury is different in kind: the reporting tools subjected them to friction, confusion, and dead ends as they worked to make the platform safer for children. The futility of their efforts due to Defendants-Appellees' defective

reporting tools and misrepresentations exacerbated their pain, not because it put them at risk of imitation of harmful acts in the videos. That is a product defect claim, not a content challenge.

## VII. ARGUMENTS

### A. The Lower Court Erred in Concluding that the Becca Schmill Foundation Lacked Standing

This Court should reverse the District Court's dismissal of the Becca Schmill Foundation's ("BSF") claims for lack of standing. The District Court rejected BSF's standing twice on the same ground: that BSF's advocacy and research activities constituted undifferentiated "core mission" work rather than a cognizable injury. ER-216; ER-10-11. That reasoning conflates the general subject matter of BSF's mission with the operational harm BSF suffered. If accepted it would effectively preclude organizational standing whenever an advocacy organization's mission overlaps with the subject of a defendant's conduct.

The governing inquiry, however, is not whether an organization's response efforts fall within its general mission, but whether the Defendant's conduct forced the organization to divert resources away from concrete programs it was otherwise pursuing. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1018 (9th Cir. 2013). These cases recognize organizational standing where the defendant's conduct "perceptibly impaired" the

organization's activities by compelling a reallocation of resources, principles unchanged by *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367 (2024).

Here, BSF plausibly alleged precisely that type of compelled diversion. The Amended Complaint ER-182 (AC ¶119) alleges that TikTok's representative, Mr. Beckerman, falsely testified under oath at an October 26, 2021 Senate hearing that the choking-challenge videos "never existed" on TikTok, dismissed reporting to the contrary as "spreading rumors" and a "hoax," claimed TikTok found "absolutely no evidence" of such videos, and asserted that content violating TikTok's Guidelines is "remove[d] automatically." *Id.* In response to that testimony, BSF launched an independent study conducted by the research firm Alliance to Counter Crime Online ("ACCO") in 2022, which found that choking-related challenges remained readily searchable on TikTok, and that user reports resulted in few removals or restrictions. ER-183 (AC ¶ 121).

The Amended Complaint alleges similar misrepresentation by YouTube. YouTube publicly stated that reported content is reviewed under its Community Guidelines and removed when violative. ER-186 (AC ¶ 135). Yet contemporaneous reporting showed that YouTube failed to meaningfully respond to harm reports. In late 2022, the BSF-ACCO study found that videos reported by the ACCO remained up without any explanation. ER-187 (AC ¶ 139).

BSF's alleged injury is categorically distinguishable from the injuries rejected in *Hippocratic Med.* and aligns squarely with the organizational injury recognized in *Havens*. *See Hippocratic Med.*, 602 U.S. at 294. In *Hippocratic Med.*, the plaintiff organizations challenged FDA drug-approval decisions affecting medications they did not use, prescribe, or interact with. 602 U.S. at 394. Their alleged injury rested on attenuated downstream effects: the possibility that member doctors might someday treat complications from the approved drugs. *Id.* at 392. The Court deemed that the organizations lacked operational nexus to the challenged conduct. *Id.* at 392–93.

By contrast, BSF alleges direct interference with its ongoing operations. BSF engages in active KOSA advocacy directed at the very lawmakers before whom Defendants-Appellees made the alleged misrepresentations ER-178 (AC ¶ 106). Defendants-Appellees' false assurances to Congress directly undercut BSF's credibility with those decisionmakers and forced BSF to divert staff time, funding, and programmatic capacity away from planned advocacy and toward real-time fact checking and corrective research. That is "far more than simply a setback to the organization's abstract social interests," *Havens*, 455 U.S. at 379, but instead "directly affected and interfered with" the activities of BSF. *Hippocratic Med.,* 602 U.S. at 395.

The District Court incorrectly dismissed this theory by invoking the principle that a plaintiff "cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." ER-10 (quoting *Hippocratic Med.*, 602 U.S. at 394). But that principle addresses voluntary advocacy expenditures, not compelled diversions caused by a defendant's conduct. *See Hippocratic Med.,* 602 U.S. at 394–96; *Valle del Sol*, 732 F.3d at 1018; ER-196 (AC ¶ 196). As alleged, BSF would have continued its planned KOSA advocacy but for Defendants-Appellees' misrepresentations, making its diverted expenditures concrete, traceable, and redressable. *See East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 663–64 (9th Cir. 2021); *Uzuegbunam v. Preczewski*, 592 U.S. 279, 285–86 (2021).

At minimum, the District Court erred in denying leave to amend. The court identified no legal bar to BSF's standing, only purported insufficient factual detail. ER-10; *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000). BSF could readily allege with greater specificity the particular programs or activities curtailed or delayed, and more resources redirected in response to Defendants-Appellees' conduct. Denial of leave to amend on this record was premature and warrants reversal.

**B. The District Court Erroneously Decided that Section 230 Bars Plaintiffs-Appellants' Claims**

(1) Section 230 Does Not Bar Plaintiffs-Appellants' Claims

Section 230 of the Communications Decency Act ("CDA") bars claims that seek to impose liability for an internet provider's publication decisions regarding third-party content. *See Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100 (9th Cir. 2009). Congress did not intend Section 230 to operate as a blanket immunity from all liability for platforms hosting third-party content. *See Doe v. Internet Brands*, 824 F.3d 846, 853 (9th Cir. 2016) ("Congress [through Section 230] has not provided an all-purpose get-out-of-jail-free card for businesses that publish user content on the internet.").

In *Barnes*, this Court articulated a three-pronged test for Section 230 immunity. *See* 570 F.3d at 1100–01. Immunity applies only where the defendant is "(1) a provider or user of an interactive computer service," (2) treated as a publisher or speaker, "(3) of information provided by another information content provider." *Id.* Critically, the second prong "precludes liability when the duty the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a publisher or speaker." *Id.* at 1007. Where liability instead arises from a defendant's own promises or product design choices, Section 230 does not apply. *Id.*

The District Court failed to apply this duty-based analysis. It incorrectly concluded that the duty underlying the Plaintiffs-Appellants' product liability and

negligence claim stemmed from the Defendants-Appellees' publisher status. ER-32-33. That is a reversible error.

To determine whether a claim is content-based and barred, the Ninth Circuit applies a two-step duty analysis. *See HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 682 (9th Cir. 2019); *Bride v. Yolo Techs., Inc.*, 112 F.4th 1168, 1177 (9th Cir. 2024); *Calise v. Meta Platforms, Inc.*, 103 F.4th 732, 742 (9th Cir. 2024). Courts ask (1) from what right the duty springs, and (2) what the duty requires the defendant to do. *Bride*, 112 F.4th at 1177.

*(a) The Asserted Duties Spring from Content-Agnostic Product Design and Representations*

Section 230 does not apply where the asserted duty arises from a defendant's own representations, contractual commitments, or product choices. *See Bride*, 112 F.4th at 1182 (stating misrepresentation claims concerning the defendant's reveal-and-ban policy were not immunized because they stemmed from separate, actionable promises the defendant made to users).

The Amended Complaint plausibly alleges that the Plaintiffs-Appellants' claims arise from Defendants-Appellees' duties as product designers, not as publishers. Defendants-Appellees had a duty "to develop a reporting tool that is reasonably safe" and "to design products that are not unreasonably dangerous." ER-164, 192 (AC ¶¶ 37, 168). Plaintiffs-Appellants seek to hold Defendants-Appellees

liable for defects in their reporting tools and misrepresentations about how those tools function. ER-202 (AC ¶ 230). The claims do not turn on third-party content, but on Defendants-Appellees' conduct in designing, promoting and operating their products. ER-164 (AC ¶ 36).

Defendants-Appellees' reporting tools incorporate multiple **content-agnostic design features** that govern user interaction and system functionality independent of moderation outcomes. These include:

| | |
|---|---|
| **Representation and Solicitation** | Prompting users to report potentially harmful content as defined by the platforms in their Policy and Guidelines, accompanied by assurances that reports will be reviewed. ER-159 (AC ¶19) ("[E]very report sent to TikTok is checked."). |
| **Access** | Requiring account creation or navigational hurdles to locate the reporting tools. ER-170-71, 180 (AC ¶¶ 67, 73, 113). |
| **Reporting Functionality** | Platform users interact with the reporting tools to generate a report. This requires users to select the reason for their report. ER-180, 183 (AC ¶¶ 114, 123). The platform represents to users that it will review reports and respond to them. *Id.* ("[E]very report that is sent to TikTok is checked" (internal citation omitted)). The platform specifically promises that reports will be reviewed against its Community Guidelines. *Id.* ("Reported content is reviewed along these [Community] guidelines" (internal citation omitted)). |
| **Review-and-Response Mechanisms** | Platforms represent to the users that the platforms will review the reports and respond. ER-186 (AC ¶ 135) ("Reported content is reviewed along [our Community Guidelines]."); ER-181 (AC ¶ 116) ("We'll review your report and take action if there is a violation of our Community Guidelines.")' *Id.*. Annie McGrath and Joann Bogard received the following automated response from YouTube: "Thanks for reporting Issue Harmful dangerous acts. If we find this content to be in violation of our Community Guidelines, we will remove it." ER-171, 173 (AC ¶¶ 68, 82). The response thus guaranteed a |

| | |
|---|---|
| | review of the flagged content for potential violations. The platform then allegedly conducts a review of the report. ER-180-184 (AC ¶¶ 111, 128). Platform users do not receive active updates regarding the status of their report and bear the burden of tracking its status by actively being on the platform. ER-181, 184 (AC ¶¶ 117, 125). |
| **Content Moderation** | The resulting output of the above functionalities are not the target of the challenge in this case. |

These are content-agnostic design choices and decisions about how a reporting tool is structured, accessed, and represented to users. The Amended Complaint alleges that "the reporting features yielded arbitrary and contradictory decisions" demonstrating that the reporting tools were incapable of functioning as promised. ER-156 (AC ¶ 11).

This Court's precedent confirms that claims challenging such design and representational choices fall outside of Section 230. In *Lemmon v. Snap, Inc.*, negligent design claims concerning Snapchat's speed filter were not immunized because the underlying duty stemmed from defendant's "distinct capacity as a product designer." *Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1092 (9th Cir. 2021). In *Bride*, misrepresentations about an app's features were actionable because liability flowed from "the promise itself," not content moderation. 112 F.4th at 1179.

Most directly, in *Doe 1 v. Twitter Inc.*, this Court held that claims challenging a platform's reporting-tool design, including access barriers and inadequate responses, did not implicate content moderation, and thus a design defect claim was not barred by Section 230. *Doe 1 v. Twitter Inc.,* 148 F.4th 635, 645 (9th Cir. 2025).

By contrast, immunity applied in *Doe v. Grindr, Inc.* only implicated content moderation itself. 128 F.4th 1148, 1153–54 (9th Cir. 2025).

Here, YouTube and TikTok's promises about how their reporting tools would function, and their failure to design tools capable of fulfilling those promises, give rise to duties independent of any obligation to remove specific content. Plaintiffs-Appellants' injuries stem from Defendants-Appellees' content-agnostic designs and misrepresentations: inducing users to report harmful content, imposing friction and opacity in reporting, and then failing to meaningfully review or respond. Section 230 does not immunize such conduct.

**1. Defendants-Appellees Can Fulfill This Duty Without Moderating Content and Thus Section 230 Does Not Bar These Claims**

Section 230 does not bar Plaintiffs-Appellants' claims because the defects alleged in Defendants-Appellees' reporting tools can be remedied through content-agnostic product design choices, without requiring Defendants-Appellees to moderate or remove any third-party content. *See HomeAway.com,* 918 F.3d at 683 (holding that Section 230 did not apply where the challenged duty "could have been satisfied without changes to content posted by the website's users"); *Internet Brands*, 824 F.3d at 849–51 (holding CDA does not bar duty-to-warn claim that "could have been satisfied without changes to the content posted by the website's users").

More recently, in *Social Media Cases*, Judge Kuhl held that negligence claims challenging platforms' interactive operational features, such as account creation process, engagement algorithms, notifications, did not require third-party content moderation to fulfill the platforms' duty of care, and therefore the claim was not barred by Section 230. *See* No. 22STCV21355, 2023 WL 6847378, at *31–33 (Cal. App. Ct. Oct. 13, 2023).

Here, the District Court acknowledged that Defendants-Appellees' duty can be fulfilled by changing their statements, without changing the way they moderate content." ER-36. Deficiencies in the Access, and Review and Response steps of Defendants-Appellees' reporting tools can likewise be remedied through content-neutral design decisions, such as modifying location of reporting process, registration requirements, and review and response mechanisms, without requiring changes to any user-generated content.

Even if the most practical way to fulfill the duty to maintain a reporting tool that functions as promised ultimately leads Defendants-Appellees to remove guideline-violative content, that downstream consequence does not transform Plaintiffs-Appellants' claims into impermissible challenges to content moderation. As this Court has explained, "assuming that removing certain listings may be the platforms' most practical compliance option, allowing internet companies to claim

CDA immunity under these circumstances would risk exempting them from most local regulations." *HomeAway.com,* 918 F.3d at 683.

Because the duties at issue can be satisfied through content-agnostic design and representational changes, and are not premised on Defendants-Appellees' status as publishers or speakers of third-party content, Section 230 does not apply. This Court should therefore reverse the District Court's ruling and hold that Section 230 does not bar Plaintiffs-Appellants' products liability and negligence claims.

### C. Appellants' Common Law Claims Were Appropriately Pleaded

(1) District Court Erred in Dismissing Common Law Products Liability Claims (Claim 1 Strict Liability)

The District Court cursorily dismissed the Strict Liability claim, reasoning that the defects in reporting tools are not a "product," and that the injury was not tethered to the defect alleged. ER-11-12.[1] The District Court's analysis is misguided in two ways: it improperly reframes Plaintiffs-Appellants' claims as challenging content moderation outcome rather than content-agnostic designs, and it conflates Plaintiffs-Appellants' harms with those of users who were exposed to harmful content on Defendants-Appellees' platforms.

---

[1] Under California strict products liability law, "a manufacturer is strictly liable in tort when an article he places on the market . . . proves to have a defect that causes injury to a human being." *Opperman v. Path, Inc.*, 87 F. Supp. 3d 1018, 1054 (N.D. Cal. 2014).

In recent decisions, courts have interpreted the Third Restatement of Torts § 19(a) broadly to encompass intangibles.[2] *See e.g.*, *In re Uber Techs., Inc., Passenger Sexual Assault Litig.*, 745 F. Supp. 3d 869, 905 (N.D. Cal. 2024).[3] These courts apply a defect-specific analysis, asking whether the alleged defect is analogous to tangible personal property in light of its function and distribution. *See In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, 702 F. Supp. 3d 809, 849 (N.D. Cal. 2023) (citing Restatement (Third) of Torts § 19(a) (A.L.I. 1998)).

---

[2] Courts in other states, including Florida and Missouri, that have adopted the Second Restatement treat intangibles as products. *Garcia v. Character Techs., Inc.*, No. 6:24-cv-1903-ACC-UAM, slip op. 36 (M.D. Fla. May 21, 2025); *T.V. v. Grindr, LLC*, No. 3:22-CV-864-MMH-PDB, 2024 WL 4128796 at *3, 22–23 (M.D. Fla. Aug. 13, 2024) The Second Restatement does not mention tangibility. Instead, restatement applies strict products liability to "any product in a defective condition" that causes "physical harm . . . to the ultimate user or consumer" and "is expected to and does reach the user or consumer without substantial change in the condition . . . ." Restatement (Second) of Torts § 402(a) (A.L.I. 1965). Here, the Plaintiffs-Appellants plausibly alleged foreseeable physical harm from the design defects and from the failure to warn users of the reporting tools as intended.

[3] Other state and district courts have found software to be a product on similar grounds. *See e.g.*, *Doe v. Lyft*, No. 23-2548-JWB-TJJ, 2024 WL 4651015 (D. Kan. Nov. 1, 2024); *Ameer v. Lyft, Inc.*, No. ED 112455, 2025 WL 679373, at *7 (Mo. Ct. App. 2025); *cf. Brookes v. Lyft, Inc*, 2022 WL 19799628, at *3 (Fla. Cir. Ct. Sep. 30, 2022) (holding that "[t]he definition of product should be fluid" and "reached in light of public policy behind the imposition of strict product liability") (internal quotation marks omitted); *T.V. v. Grindr*, 2024 WL 4128796, 22–23 (M.D. Fla. 2024) (relying primarily on *Brookes* for concluding Grindr "designed to facilitate the coupling of gay and bisexual men" was a product); *A.M. v. Omegle.com, LLC*, 614 F. Supp. 3d 814, 819 (D. Or. 2022) (finding Omegle.com, a "free online chat room that randomly pairs strangers from around the world for one-on-one chats," to be a product without explicitly addressing the debate on when software is a product).

Applying that framework, the *Social Media Adolescent Addiction* court held that defective parental controls and age verification features on social media apps were analogous to tangible products like parental locks on prescription medicine bottles. *Id.* at 849.

Then, the court found that the defects alleged are content agnostic because "these identified defects primarily relate to the manner in which young users are able to access defendants' apps," the process of signing up, and the ability of parents to control the activities on the app. *Id*. (underscore added) The court rejected the Defendants-Appellees' contention that the defects identified are inseparable from content. Other courts have reached the same conclusion using similar reasoning. In *Uber Technologies*, the court held that alleged defects in the Uber app's GPS-based safety features were comparable to defects in tangible products that rely on location tracking, such as Apple AirTags. 745 F. Supp. 3d at 905. The court explained that the Uber app's alleged defect, its failure to use GPS to provide safety alerts, was functionally indistinguishable from a tangible product's failure to perform the same safety function. *Id*. Similarly, in *Hughes v. Apple, Inc*., the California district court allowed the plaintiffs' strict products liability claims to proceed where plaintiffs alleged that Apple AirTags lacked adequate safety measures, such as timely screen alerts and effective sound alerts, enabling stalking and causing injuries. *Hughes v. Apple, Inc,* 723 F. Supp. 3d 693, 709 (N.D. Cal. 2024). Although the safety features

were intangible, the court treated them as product defects based on their function, further eroding any rigid tangible-intangible distinction.

Here, under a defect-specific analysis, the alleged defects in YouTube and TikTok's reporting tools are directly analogous to the safety-system defects recognized as products in the aforementioned cases. The challenged defects, relating to Access, Reporting, Review and Response, mirror the content-agnostic defects identified in *Social Media Adolescent Addiction,* which survived a motion to dismiss. *See* 702 F. Supp. 3d at 842, 849 (finding content-agnostic defects under the "repeatedly reaffirmed" "logic of *Winter v. G.P. Putnam's Sons:*, 938 F.2d 1033, 1036 (9th Cir. 1991)). That analogy is reinforced by *Uber Technologies,* where the court held that Uber App's safety-alert and tracking tools were functionally indistinguishable from tangible products such as Air Tags. *See* 745 F. Supp. 3d at 905. As in *Uber Technologies*, the automated reporting tools at issue here perform safety functions independent of content and were therefore properly treated as product design defects. Finally, *Hughes* confirms that intangible safety features, such as screen alerts and sound alerts, may constitute product defects when their design enables harm. 723 F. Supp. 3d at 709. Taken together, these cases compel the conclusion that the reporting tool defects alleged here are products subject to strict products-liability principles.

In *Neville v. Snap, Inc.*, the California Superior Court went further still, holding that only after discovery "on a developed factual record" could it determine whether an app (Snapchat) constitutes a product under California law. *See Order Sustaining in Part and Overruling in Part Defendant's Demurrer to Pls' 2d Amend. Compl*. 27–28, *Neville v. Snap, Inc.*, No. 22STCV33500 (Cal. Sup. Oct. 18, 2023). The court expressly declined to resolve that question at the pleading stage. Instead, choosing to "revisit" whether products-liability principles applied only after examining the product's "characteristics, functionalities, distribution, and uses." *Id.* at 26. The same restraint was warranted here: The District Court should have permitted discovery before prematurely concluding that Defendants-Appellees' reporting tools are not products.

Public policy likewise supports the broader reading of the Third Restatement that recognizes intangibles as products. Product liability law developed to "reduce the hazards to life and health inherent in defective [mass-produced] products that reach the market." *Escola v. Coca Cola Bottling Co. of Fresno*, 24 Cal. 2d 453, 462 (1944) (Traynor, J., concurring); *see also* Restatement (Third) of Torts: Products Liability § 19, cmt. A. Defendants-Appellees' platforms and reporting tools are more akin to "mass production" consumer products than to individualized "handicraft," having been placed "on the market" for mass use through app stores. ER-157, 162 (AC ¶¶ 13, 29). Treating such platforms as products aligns with the core rationales

of strict liability: users lack the technical ability to investigate platforms' complex digital systems; safety-focused marketing encourages reliance; and the scale and opacity of the platforms leave users unable to protect themselves. *Escola*, 24 Cal. 2d at 467; *Greenman v. Yuba Power Prods., Inc.*, 59 Cal. 2d 60, 63 (1963).[4] Those vulnerabilities are at least as acute, if not more so, for users injured by large-scale digital platforms than for those harmed by traditional tangible products.

Finally, absent products liability accountability, injured users must bear "the costs of injuries resulting from defective products" alone. *Yuba Power Prods., Inc.*, 59 Cal. 2d at 63. TikTok and YouTube derived substantial economic benefit from users' engagement with their platforms and reporting tools. ER-167, 200-201, 204 (AC ¶¶ 52, 215, 223, 247). Simultaneously, Defendants-Appellees' "exclusive control over information about the reported offenses" left users "powerless to protect themselves" and bear the costs alone. ER-194 (AC ¶ 178); *Yuba Power Prods., Inc.*, 59 Cal. 2d at 63. These policy considerations favor treating Defendants-Appellees' software as a product for the purposes of product liability.

---

[4] Tyrone Stewart, *TikTok Launches Fun Online Safety Video Series*, Mobile Marketing (Feb. 27, 2019. *See* https://mobilemarketingmagazine.com/tiktok-launches-fun-online-safety-video-series/ (discussing "initiative aimed at helping users to stay safe when using its app[, which] . . . comes following the news that it has crossed the 1bn installs mark").

The District Court erroneously concluded that Plaintiffs-Appellants' alleged harms "stemm[ed] from their repeated viewing of distressing content" and were tied to Defendants-Appellees' content moderation decisions rather than from defects in reporting tools.[5] ER-12-13. The court quotes from the complaint which states the harms from "making reports that do not lead to any meaningful review" but concludes without basis that the harm is tied to Defendants-Appellees' content removal decisions. *Id*. This is plainly improper.

To the contrary, Plaintiffs-Appellants sufficiently pleaded that content-agnostic design defects caused harms to Plaintiffs-Appellants. The content-agnostic functions related to (i) Representation and Solicitation; (ii) Access; (iii) Report; and (iv) Review and Respond. Plaintiffs-Appellants sufficiently pleaded that defects in each content-agnostic function were tethered to their injuries as outlined below:

- **<u>Representation</u> (i) and <u>Report</u> (iii):**

---

[5] The District Court did not rule on whether emotional harm can be considered physical injury under California law, but assumed, "without deciding, that Plaintiffs plausibly allege emotional distress of such severity that it could satisfy the requisite element of harm for purposes of a strict products liability claim." ER-13. Here, multiple Plaintiffs alleged physical harm. Ms. Doe was "exhausted[,] . . . tormented," and "unable to sleep." ER-154,196 (AC ¶¶ 3, 195). Ms. McGrath suffered "loss of health" due to the defects. ER-174 (AC ¶ 86); *see also Hughes*, 723 F. Supp. 3d at 710 (denying dismissal of strict products liability claims reasoning that it has found "no doctrine that precludes the vindication of an emotional injury in a products liability case").

*Defect:* Defendants-Appellees "fail to provide adequate warnings to users and those making reports about the dangers associated with their reporting tool." ER-192, 194 (AC ¶¶ 167, 180). Defendants-Appellees knew, or should have known that failing to warn in soliciting would have caused harm similar to that experienced by Plaintiffs-Appellants. ER-192 (AC ¶¶ 166, 169) ("It was near certain that the arbitrary reporting process would cause harm to users who make reports.").

*Cause & Harm:* Due to the failure to warn, Plaintiffs-Appellants used the product in the manner recommended "to constantly make reports." ER-192 (AC ¶ 167). Because the reporting tools did not function as stated, Plaintiffs-Appellants "suffer[ed] severe mental harm, leading to emotional distress, pain, and suffering . . . ." ER-193 (AC ¶ 170). For instance, Ms. Bogard "fe[lt] betrayed by the companies' blithe lies about reviewing user reports." ER-172 (AC ¶ 75). The defective reporting process and failure to review created a sense of invalidation, helplessness, futility, discouragement, and emotional agony to the users who made reports ER-172, 192 (AC ¶ 75, 166). By misrepresenting that their reporting tools are intended to prioritize users' safety, it harmed consumers like Plaintiffs-Appellants who relied on these words to

constantly make reports by having to watch the traumatic scenes of children's suffering repeatedly. ER-192 (AC ¶ 167).

- **Access (ii)**

  Defect: Defendants-Appellees created reporting tools which are unreasonably difficult to access by requiring account creation for reporting and by making the tools difficult to find. ER-170, 171, 180 (AC ¶¶ 67, 73, 113).

  Causation and Harm: The tools' inaccessibility caused Plaintiffs-Appellants "emotional distress, pain, and suffering." ER-170, 192 (AC ¶¶ 67, 166). This frustration was further amplified when, after "making reports, it did not lead to any meaningful review." ER-192 (AC ¶ 167).

- **Review and Response (iv):**

  Defects: (1) the tool failed to review the reports and respond as stated in the Community Guidelines, and (2) failed to provide updates on the status of their reports, forcing Plaintiffs-Appellants to bear the burden of tracking the reports statuses. ER-180, 181, 184, 186 (AC ¶¶ 111, 116–17, 125, 128, 137). The Defendants-Appellees stated they would review reported content along their Community Guidelines, but there "was no chance for Plaintiffs-Appellants to obtain a meaningful review." ER-156 (AC ¶ 10). In fact, Defendants-Appellees could not

do so because of the defective design of their reporting tool. *See also* ER-156, 193 (AC ¶¶ 10, 176).

Causation/Harm: "The defective reporting process and failure to review creates a sense of invalidation, helplessness, futility, [physical pain,] discouragement, and emotional agony to the users who make reports on Defendants' platforms." ER-192-93 (AC ¶¶ 166, 170). Defendants-Appellees' "failure to review the reported content against its guidelines, and ultimate invalidation of her voluntary efforts to report harmful content, caused Ms. Doe to feel emotional distress, anxiety, helplessness, and frustration." ER-177 (AC ¶ 102). Ms. Bogard stated she was brought to tears feeling "retraumatized" when she saw her reports being ignored, "wondering if [her] son would still be alive had someone taken action about the video prior to his exposure." ER-172 (AC ¶ 75). The "failure to review Annie's reports exacerbated feelings of helplessness, anxiety, and lack of closure" causing loss of health, and time. ER-174 (AC ¶ 86).

In California, causation requires showing that the alleged defects were a substantial factor in causing the injury. *Himes v. Somatics*, LLC, 16 Cal. 5th 209, 222 (2024). "The substantial factor standard is a relatively broad [test], requiring only that the contribution of the individual cause be more than negligible or

theoretical." *Rutherford v. Owens-Illinois, Inc.*, 16 Cal. 4th 953, 978 (1997). The content-agnostic defects and corresponding harms listed above show that Plaintiffs-Appellants' alleged harms are tethered to the defective content-agnostic elements of the reporting tools. While all steps of the reporting tools may contribute to injuries, the District Court may not exclusively tie the harms to Defendants-Appellees' content moderation decisions. *Bunch v. Hoffinger Indus., Inc.*, 123 Cal. App. 4th 1278, 1302 (2004) (stating a defendant's product need not be the sole potential proximate cause of injury but only must substantially contributed to the injury and the circumstances). In the *Social Media Cases*, Judge Kuhl found that a concurrent content-based cause was not a bar to a content-agnostic cause. 2025 WL 3207660, at *2 (leaving the question of whether a content-agnostic cause was sufficiently pleaded to be a "substantial factor" as a question for the jury). Therefore, because there are plausible content-agnostic defects that cause harm, the claim should proceed.

(2) <u>District Court Erred in Dismissing Negligence (Claim 2)</u>

The District Court erred in its holding that no authority supports an affirmative duty arising from Defendants-Appellees' operation and solicitation of their reporting tools. ER- 14. As alleged in the Amended Complaint (ER-153), Defendants-Appellees owed users (a) a general duty to exercise reasonable care in designing, maintaining, and distributing their product to avoid unreasonable risk of harm,

particularly to minors and ER-193 (AC ¶ 176); (b) a duty arising from their voluntary undertaking of the reporting tool function, over which they exercised exclusive control. *See* ER-193-94 (AC ¶ 177–178). Defendants-Appellees breached those duties by failing to exercise ordinary care toward users who relied upon the reporting tools to review the harmful contents. *Id.* at ER-194 (AC ¶ 182).

*(a) General Duty*

In similar contexts, this Court and courts in this Circuit recognized a general duty of manufacturers to avoid presenting an unreasonable risk of injury or harm to the public. *See Lemmon v. Snap, Inc*., 995 F.3d 1085, 1092 (9th Cir. 2021) (recognizing in a negligent product defect claim against Snapchat app that manufacturers have a "duty to exercise due care in supplying products that do not present an unreasonable risk of injury or harm to the public"); *Hughes*, 723 F. Supp. 3d at 702 (denying dismissal of products liability claims and recognizing Apple has a "duty to use reasonable care in its AirTag design to mitigate harm from stalking"); *Soc. Media Adolescent Addiction*, 702 F. Supp. 3d at 855 (holding that defendants owe users the duty to design products in a reasonably safe manner and to warn about risks they pose).

In even more analogous cases, this Court upheld that platforms have a duty to design a reporting system that is easy to report harms. See *Doe 1 v. Twitter, Inc*., 148 F.4th 635, 645 (9th Cir. 2025) (upholding a products liability and negligence per se

claim for Twitter's failure to design reporting infrastructure to report Child Sexual Abuse Material, recognizing Twitter had a "purported duty to cure reporting infrastructure deficiencies"); *Soc. Media Adolescent Addiction*, 702 F. Supp. 3d at 855 (recognizing a duty to design their platforms to include "reporting protocols [that] allow users or visitors . . . to report CSAM and adult predator accounts specifically without the need to create or log in to the products prior to reporting").

Aligned with all of the cases above, here, Appellants seek to hold Defendants-Appellees liable for their failure to exercise ordinary care in how they elected to design, operate, and promote their reporting tools. ER-193-94 (AC ¶ 177). Through their representations about the reporting tools' functionality, Defendants-Appellees led platform users to believe that their reporting tools comprehensively reviewed content that users reported against the stated platform policies. ER-159-60 (AC ¶ 19) ("[E]very report that is sent to TikTok is checked.") (internal citation omitted); *Id.* ("Reported content is reviewed along these [Community] guidelines . . . .") (internal citation omitted). Defendants-Appellees' choices created a reasonably foreseeable risk of harm to platform users and worsened their existing position. *See* Witkin, Summary of California Law, Torts, § 961 (11th ed. 2025) (defining a "legal duty" of care as "the duty of a person to use ordinary care in activities from which harm might reasonably be anticipated"); ER-193-94 (AC ¶¶ 177), 180, 182. Defendants-Appellees created a risk of harm in each of their design decisions regarding reporting

tool location, account registration requirements, reporting form layout, review-and-response automation, and report tracking. ER-170-71, 180-81, 183-84 (AC ¶¶ 67, 73, 113, 114, 117, 123, 125). The anticipated harm to users includes: (1) wasted valuable user time, (2) frustration caused for users when they received automated responses, (3) general "sense of invalidation, helplessness, futility, discouragement, and emotional agony," and (4) financial injury for users." ER-174, 176,192, 198 (AC ¶ 86, 95, 166, 208). Ms. Doe struggled to sleep and felt "ignored, anxious, and helpless" due to how Defendants-Appellees created, designed, and promoted their reporting tools. ER-176 (AC ¶ 95). Ms. McGrath suffered "both emotional and financial injury . . . due to the loss of health, time, and having to take time off work." ER-174 (AC ¶ 86). Ms. Bogard shared that she felt ignored, betrayed, and retraumatized when she saw her reports go unreviewed by Defendants-Appellees' reporting tools. ER-172 (AC ¶ 75). These harms arose from Defendants-Appellees' choices regarding their reporting tools—without said choices, the harm could not have arisen. Therefore, Defendants-Appellees had a duty to develop a reporting tool that does not create unreasonable harm.

*(b) Duty to Rescue*

Moreover, Defendants-Appellees actively took on the affirmative role of a rescuer ER-193-94 (AC ¶ 177) creating a duty to rescue under California common law. *See Williams v. State of California*, 34 Cal. 3d 18, 22 (1983) (establishing that

there is no general duty to rescue under California common law). Even if a person has no preexisting duty to provide aid or attempt a rescue, he or she can be liable in tort if "'(1) the person voluntarily "undertakes to perform acts to rescue or aid those in distress,' and (2) his or her efforts to rescue (a) are reckless or wanton (that is, grossly negligent), (b) are negligent and place the plaintiff in a worse position (by increasing the risk of harm to him) than if there had been no rescue effort, or (c) prompt the plaintiff to detrimentally rely on the rescue effort." *McHenry v. Asylum Ent. Delaware, LLC*, 46 Cal. App. 5th 469, 486 (2020).

Through the creation and promotion of their reporting tools, Defendants-Appellees voluntarily undertook an action to create a tool to "aid those in distress" on their platforms. ER-156-57 (AC ¶ 12). By misrepresenting the capability of and urging users to avail themselves of the reporting tools, Defendants-Appellees placed Appellants in a worse position by increasing their risk of harm from frustration and retraumatization due to the reporting tools not functioning as stated. ER-193-94 (AC ¶ 177). As described above, Appellants "suffered severe mental harm, leading to emotional distress, pain, and suffering as well as a futile waste of time" and financial losses due to their usage of Defendants-Appellees' reporting tools. ER-193 (AC ¶ 170).

This duty to rescue is content-agnostic. The duty arose from Defendants-Appellees' creation and design of reporting tools, not from their publication of third-

party content. *Cf. Soc. Media Adolescent Addiction*, 702 F. Supp. 3d at 845 (finding plaintiffs' claims were content-agnostic as the injuries were separable from content). While the District Court did not analyze the other elements of negligence (breach, causation, harm), this Court should find all other elements (causation, harm) of negligence are sufficiently pleaded. *See supra*, 22-31.

**(3)** District Court Erred in Dismissing Misrepresentation Claims (Claims 3 and 4)

The District Court erroneously dismissed Plaintiffs-Appellants misrepresentations when it found (i) Defendants-Appellees' policies are not actionable misrepresentations, (ii) Defendants-Appellees' statements to lawmakers are not actionable misrepresentations, (iii) Plaintiffs-Appellants did not plead actual reliance on the "review and remove" statements. ER-17-20.

First, the District Court erroneously found that the following "Statements regarding Defendants-Appellees' policies" are not actionable misrepresentations because it merely "described Defendants-Appellees' general policies" about "content that is allowed or not allowed on the platform. . . ." ER-17.

> **YouTube Policies**: "YouTube doesn't allow content that encourages dangerous or illegal activities that risk serious physical harm or death."
>
> **YouTube Guidelines**: We enforce these Community Guidelines using a combination of human reviewers and machine learning, and apply them to everyone equally—regardless of the subject or the creator's background, political viewpoint, position, or affiliation.
>
> **YouTube Policies**: The following types of content are not allowed on YouTube. This isn't a complete list. Asphyxiation: Any

> activity that prevents breathing or can lead to suffocation like: Choking, drowning, or hanging games.
>
> **TikTok Guidelines:** We don't allow: Content that shows or suggests inappropriate use of dangerous tools or objects. Content that shows dangerous driving behavior. Content that shows or promotes ingesting substances that are not meant for consumption and could lead to severe harm. Content that describes or provides instructions on how to perform a dangerous activity. Dangerous games, dares, challenges or stunts that might lead to injury or property damage. ER-17.

Contrary to the District Court's holding, in *Social Media Adolescent Addiction*, 753 F. Supp. 3d 849, 892 (N.D. Cal. 2024), the court held that the states-plaintiffs alleged a plausible theory of deception based on Meta's policy which stated that it would not allow children under the age of 13 on Instagram. *Id*. The court held allegations that "[d]espite its public-facing claims that users under the age of 13 are not allowed on Instagram" combined with internal documents revealing that Meta pursued the under-13 Instagram users, plausibly stated deception claims. *Id*. ("Selective application of Meta's under-13 policy combined with an alleged pattern of pervasive inaction can render deceptive Meta's reassurances to the contrary.").

Also, in *State v. TikTok Inc*., 245 N.E.3d at 686–87 (Ind. Ct. App. 2024) the court found that TikTok's "Community Guidelines are actionable misrepresentations" under Indiana Consumer Protection laws where "TikTok's Community Guidelines state that TikTok do[es] not allow showing or promoting recreational drug use, or the trade of alcohol, tobacco products, and drugs," but the "TikTok platform contains abundant content about drug use" and alleged that

TikTok in fact "mak[es] no attempt to enforce certain of its Community Guidelines as written." *Id*.

Moreover, in *TikTok, Inc. v. Eighth Jud. Dist. Ct. in & for Cnty. of Clark*, 578 P.3d 640, 651 (2025), the Supreme Court of Nevada affirmed denial of TikTok's motion to dismiss where the state-plaintiff alleged "TikTok made misrepresentations about its enforcement of the platform's community guidelines and the safety measures that TikTok implements." *Id*. (discussing primarily Section 230, while finding that the misrepresentation claims survive a motion to dismiss).

Similarly, here, Defendants-Appellees made statements in their Policies and Guidelines about not allowing certain contents and the enforcement of said Policies and Guidelines. These statements were made to "upkeep a pretense of safety." ER-159-60, 178, 182, 200 (AC ¶¶ 19, 105, 119, 215). Defendants-Appellees wanted the "public, consumers, regulators, and the media" to believe their reporting tools conducted a meaningful review of reports. ER-196-97 (AC ¶ 197). However, combined with the factual allegations that the Defendants-Appellees did not actually enforce their policy nor had the right tools to do so, the Plaintiffs-Appellants' claims plausibly allege misrepresentation. ER-187 (AC ¶¶ 139); *See e.g., Soc. Media Adolescent Addiction*, 753 F. Supp. 3d at 892 ("Selective application of Meta's under-13 policy combined with an alleged pattern of pervasive inaction can render deceptive Meta's reassurances to the contrary.").

Second, the District Court erred in finding that TikTok's sworn statement to lawmakers was not actionable misrepresentation. ER-159-60 (AC ¶ 19) ("Senator we have not been able to find any evidence of a black out challenge on TikTok at all. And again, it would violate our guidelines but it's something that we would proactively search [for] both with AI and Human Moderators. We have found absolutely no evidence of it."). Without further analysis, the lower court cursorily concluded that "a testimony in a Senate hearing cannot form the basis of a state common law misrepresentation claim," and that "Plaintiffs did not state a claim for negligent or fraudulent misrepresentation *on their own behalf*." ER-18. Recent cases instruct reversal of this holding. In *TikTok, Inc. v. Cnty. of Clark*, 578 P.3d at 645, the complaint alleged that "TikTok, Ltd.'s CEO stated in testimony to Congress that '[TikTok] will keep safety—particularly for teenagers—a top priority'" and that testimony was the basis for pleading misrepresentation claims. *Id*. The court ruled that under Nevada's laws, TikTok's alleged statements and omissions to regulators set a plausible basis for misrepresentation claims. *Id*. Similarly, in *State v. TikTok Inc.*, 245 N.E.3d at 687, the court denied dismissal of claims where the state alleged misrepresentation based on the factual allegation: "TikTok, through representatives, including its CEO in statements to a committee of Congress, and other public statements, has repeatedly refuted the risk of foreign government access to TikTok's collected personal data." *Id*. (underscore added). Similarly, here, Plaintiffs-

Appellants alleged that they relied on Defendant-Appellant's misrepresentation to lawmakers, but the District Court improperly disposed of these allegations. ER-196, 198 (AC ¶¶ 195, 206).

Third, while the District Court correctly found that the "review and remove" statements were actionable misrepresentations, it erred in deciding that Plaintiffs-Appellants had "not pled actual reliance [or] . . . harm caused by reliance on those statements." ER-19–20. The review and remove statements were alleged as follows:

> **YouTube Policies:** YouTube doesn't allow content that encourages dangerous or illegal activities that risk serious physical harm or death.
> **TikTok's self-created public campaign and content, "#safertogether" in November 2021:** TikTok claims in their "Learn How Reporting Works" video that "every report that is sent to TikTok is checked."
> **TikTok's statement in the Safety Page:** We remove content that features dangerous, harmful or criminal behaviors. We will also remove videos that discuss dangerous challenges if they contain unfounded warnings which seek to spread fear and panic, or include instructions or depictions of harmful behavior. If you're not sure whether a video is potentially harmful, report it to us and we'll take a look. *Id.* at 12.

*Id.* at 12. YouTube's Policies and TikTok's Statements on its Safety Page are incorporated in the same webpages that set forth the platforms' respective Policies and Community Guidelines, all of which Plaintiffs-Appellants alleged they saw and relied upon. Plaintiffs-Appellants have pleaded actual reliance specifically on YouTube's and TikTok's Policies and Community Guidelines in the below paragraphs:

- ER-174 (AC ¶ 83) (Annie McGrath): Ms. McGrath relied on YouTube's own statement in its Policies which categorize the choking challenge as a depiction of dangerous acts and "Extremely dangerous challenges: The following types of content are not allowed on YouTube. This isn't a complete list. Asphyxiation: Any activity that prevents breathing or can lead to suffocation like: Choking, drowning, or hanging games."
- ER-172 (AC ¶ 75) (Joann Bogard): I report every video that I can find (and there are many) as "harmful content" relying on the social media companies' promise to remove them based on their own guidelines. . . I feel betrayed by the companies' blithe lies about reviewing user reports and their commitment to remove choking challenge videos and other harmful materials.
- ER-172 (AC ¶ 75) (Joann Bogard): Ms. Bogard relied on YouTube's own statement in its policies which categorized the choking challenge as a "depiction of dangerous acts" and 'Extremely dangerous challenges:"
- ER-169-70 (AC ¶ 65) (Joann Bogard): "The following types of content are not allowed on YouTube. This isn't a complete list. Asphyxiation:

Any activity that prevents breathing or can lead to suffocation like: Choking, drowning, or hanging games." (YouTube's Policy)

A plaintiff experiences actual reliance when a misrepresentation substantially influences their decision to act. *See Whiteley v. Philip Morris Inc.*, 117 Cal. App. 4th 635, 678 (2004). This does not demand that the misrepresentation was the "sole or even the predominant or decisive factor in influencing [the plaintiff's] conduct . . . . It is enough that the representation has played a substantial part, and so has been a substantial factor, in influencing [the plaintiff's] decisions." *Engalla v. Permanente Med. Grp., Inc.*, 15 Cal. 4th 951, 976–97 (1997) (quoting Restatement (Second) of Torts § 546, cmt. b). To plausible plead actual reliance, a plaintiff must allege he or she was "exposed to a false or misleading representation." *Gonzales v. Nat. Factors Nutritional Prods. Inc.*, No. 2:24-CV-02584-DSF-AS, 2024 WL 4609853, at *6 (C.D. Cal. June 28, 2024); *see also Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1363 (2010) (affirming dismissal where the plaintiff failed to allege that he ever visited the defendant's website and read the alleged misrepresentation).

Here, in the Amended Complaint, the Plaintiffs-Appellants Annie McGrath and Joann Bogard specifically refer to and quote the documents and webpages of YouTube's Policies and TikTok's Community Guidelines, and alleged exposure to the misrepresentations. ER-169-70, 174 (AC ¶¶ 65, 83); *see Gonzales v. Nat. Factors Nutritional Prods. Inc.*, 2024 WL 4609853, at *6. Plaintiffs-Appellants then state

that they relied on the statements in those documents and webpages, and were harmed as a result of the misrepresentations. ER-172, 174, 196 (AC ¶¶ 75, 83, 195). Plaintiffs-Appellants therefore sufficiently alleged actual reliance on the Defendants-Appellees' misrepresentations. *See Whiteley*, 117 Cal. App. 4th at 678 ("Actual reliance occurs when a misrepresentation is 'an immediate cause of [a plaintiff's] conduct, which alters his legal relations,' and when, absent such representation, 'he would not, in all reasonable probability, have entered into the contract or other transaction.'").

Plaintiffs-Appellants' reliance on the misrepresentations was justifiable. *See Brownlee v. Vang*, 235 Cal. App. 2d 465, 474 (1965) (holding that a plaintiff experiences justifiable reliance when they are personally justified in relying on a defendant's misrepresentations). Plaintiffs-Appellants felt justified to rely on statements placed in official platform Policies and Guidelines and legitimately believed Defendants-Appellees' misrepresentations. ER-159-60 (AC ¶ 19).

Plaintiffs-Appellants pleaded sufficient facts to sustain an inference of proximate causation and harm at this stage. Plaintiffs-Appellants were bereaved parents seeking to utilize the reporting tools to help protect other children. ER-155 (AC ¶ 6). Plaintiffs-Appellants relied on the representations that Defendants-Appellees made to platform users in deciding to make reports. ER-162 (AC ¶ 27). "Defendants' fraudulent misrepresentations proximately caused harm to Plaintiffs

. . . who experience emotional harm, feelings of frustration, helplessness, and anxiety about the reporting process." ER-197 (AC ¶ 200); *see OCM Principal Opportunities Fund, L.P. v. CIBC World Mkts Corp.*, 157 Cal. App. 4th 835, 873–75 (2007) (stating that proximate causation requires showing that a defendant's fraudulent conduct was a substantial factor in causing the harm). Therefore, this Court should find that Plaintiffs-Appellants sufficiently alleged actual reliance, harm, and that the common law misrepresentation claims are well-pleaded.

**(4)** District Court Erred in Dismissing State Statutory Claims (Claims 5 through 8)

*(a) Indiana Deceptive Consumer Sales Act (Claim 5)*

First, the District Court erred in deciding that Ms. Bogard has not plausibly alleged an actionable misrepresentation. Defendants-Appellees' statements were factual representations concerning the performance and characteristics of their products which makes them actionable misrepresentations. Ind. Code Ann. § 24-5-0.5-3(b)(1). The Indiana Deceptive Consumer Sales Act (IDCSA) is a remedial statute to be liberally construed to protect consumers from deceptive practices. Ind. Code Ann. § 24-5-05-1 ("This chapter shall be liberally construed and applied to promote its purposes and policies" which include "protect[ing] consumers from suppliers who commit deceptive and unconscionable sales acts . . . ."). In *State v. TikTok, Inc.*, the court found that two IDCSA claims against TikTok were actionable. 245 N.E.3d 681, 696–97 (Ind. Ct. App. 2024). There, the state alleged that TikTok

implicitly or explicitly misrepresented to users through its public statements what contents are allowed, and the enforcement of its Community Guidelines. *Id.* at 696. These misrepresentations were made to induce users to download and access the app. *Id.* at 697. The court held that "reasonable persons might have relied on those representations and omissions," and therefore concluded that plaintiffs stated a claim under the IDCSA. *Id.* Like the defendants in *State v. TikTok, Inc.* who made misrepresentations to induce users to download and use their app, Defendants-Appellees' statements about the functionality and capabilities of their reporting tools were positive assertions about present material facts at the time they were made. 245 N.E.3d at 696–97; ER-159-60 (AC ¶ 19). Based on the analysis in Claims 3 and 4 above, this Court should find that Plaintiff-Appellant Bogard's IDCSA misrepresentation claim is actionable.

Second, Ms. Bogard sufficiently alleged that Defendants-Appellees had the requisite intent to mislead consumers through their misrepresentations. Under the IDCSA, "[a]n intent to defraud or mislead is a required element of an incurable deceptive act." *Shea v. GM LLC*, 567 F. Supp. 3d 1011, 1024 (N.D. Ind. 2021). Ms. Bogard plausibly pleaded that "Defendants made [these representations] with knowledge of [their] falsity and with an intent to deceive users, consumers, regulators, and the media, like Ms. Bogard." ER-197 (AC ¶ 198). The representations happened "in response to pressures by regulators, consumers, and

media who . . . exposed the harm caused by unlimited distribution of harmful materials on [Defendants-Appellees'] platforms." ER-196 (AC ¶ 193). Defendants-Appellees wanted to "upkeep a pretense of safety," by misrepresenting their reporting tools and misleading consumers. ER-200 (AC ¶ 215).

Third, Ms. Bogard alleged actual damages in the form of property or monetary loss. Under the IDCSA, "[a] person relying upon an uncured or incurable deceptive act may bring an action for the damages actually suffered as a consumer as a result of the deceptive act or five hundred dollars ($500), whichever is greater." Ind. Code Ann. § 24-5-0.5-4(a). Here, the District Court correctly found that a "consumer transaction is not limited to an "exchange for money," but include "*any* consideration to effectuate the transfer of property." ER-23 ("Defendants provide users like Ms. Bogard access to their reporting tools and other features on their platforms, and in exchange, users provide 'data' and 'engagement' to Defendants, which has value to Defendants for purposes of selling advertising to third parties. Such an exchange satisfies the 'consumer transaction' requirement of the IDCSA.")

While the District Court was correct that, generally, "damages for emotional distress may not be recovered in the absence of physical injury," this rule does not preclude recovery for property or economic damages. *Horizon Bank v. Huizar*, 178 N.E.3d 326, 341 (Ind. Ct. App. 2021) (quoting *Captain & Co. v. Stenberg*, 505 N.E.2d 88, 100 (Ind. Ct. App. 1987)). "'[D]amages actually suffered' is defined as

'[a]n amount awarded to a complainant to compensate for a proven injury or loss; damages that repay actual losses.'" *Hoosier Contractors, LLC v. Gardner*, 212 N.E.3d 1234, 1239 (Ind. 2023) (quoting *Actual Damages*, Black's Law Dictionary (11th ed. 2019)). Economic loss doctrine is cabined to tort claims and therefore does not bar recovery for economic damages in the statutory context. *See Indianapolis-Marion Cty. Pub. Libr. v. Charlier Clark & Linard, P.C.*, 929 N.E.2d 722, 727–36 (Ind. 2010) (tracking the development of the economic loss rule for tort claims in Indiana and acknowledging exceptions to the rule where a special duty exists or public policy considerations warrant such exceptions).

The damages actually suffered by Ms. Bogard can be measured under a loss-of-bargain theory, that measures damages based on the value the injured party would have received if the representation had been true. *Loss-of-Bargain Rule*, Black's Law Dictionary (12th ed. 2024). As acknowledged by the District Court, Defendants-Appellees took Ms. Bogard's data, including from engagement, to generate profit in exchange for their services. ER-23.

It is plausibly alleged that consumer data is recognized as a monetary asset, and consumers relinquish this asset in exchange for digital services. *See id.; see also In re Adobe Sys., Inc. Privacy Litig.*, 66 F.Supp.3d 1197, 1224 (N.D. Cal. 2014) (affirming the value of consumer data by suggesting that a company's cybersecurity practices have economic value because they reduce the risk of consumer data theft);

*Irwin v. Jimmy John's Franchise, LLC,* 175 F. Supp. 3d 1064, 1070 (C.D. Ill. 2016) (recognizing the value of consumer data by finding an "implicit agreement to safeguard the customer's information"); *see generally Data Privacy in Bankruptcy: The Consumer Privacy Ombudsman*, 138 Harv. L. Rev. 1451 (2025), https://harvardlawreview.org/print/vol-138/data-privacy-in-bankruptcy-the-consumer-privacy-ombudsman (explaining that customer data is increasingly considered an asset in bankruptcy asset sales). This Court can infer from the pleading that Ms. Bogard "place[d] significant value in" the reliability of reporting tools and had she "known the truth about Defendants'" may not have used their reporting tools in the same way or at all. *See In re Marriott Intl., Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 462 (D. Md. 2020). Thurs, Ms. Bogard did not derive the benefit of the bargain she would have received had Defendants-Appellees' representations regarding the functionality and capability of their reporting tools been true. ER-169-71 (AC ¶¶ 63–65, 71) (describing Ms. Bogard has continually made reports on Defendants-Appellees' platforms since May 2019 in reliance on their representations regarding their reporting tools); ER-200 (AC ¶ 215) (describing how Defendants-Appellees profited off their misrepresentations because "Defendants designate a monetary value per each user who are subject to the targeted ads and makes profit out of each user's timed engagement"). Therefore, this Court

should find that Plaintiff-Appellant Bogard's misrepresentation claim was properly alleged under IDCSA.

***(b)** Wisconsin Deceptive Trade Practices Act (Count 6)*

The District Court erred in two ways: First, the District Court incorrectly held that for the same reasons discussed in Claims 3 and 4, Ms. McGrath had not plausibly alleged an actionable misrepresentation. *Id.* at 20. Second, the District Court wrongly held that Ms. McGrath "ha[d] not connected her alleged loss to any particular misrepresentation of fact." *Id.* at 21 ("[S]he does not allege that she was induced to report content based on any specific untrue, deceptive, or misleading representation . . . .").

Plaintiff, Ms. McGrath, plausibly pleads the required elements under the Wisconsin Deceptive Trade Practices Act (DTPA). Wis. Stat. Ann. § 100.18 (West). " (1) [T]he defendant made a representation to 'the public' with the intent to induce an obligation, (2) the representation was 'untrue, deceptive, or misleading,' and (3) the representation materially caused a pecuniary loss to the plaintiff." *Spacesaver Corp. v. Marvel Grp., Inc.*, 621 F. Supp. 2d 659, 662 (W.D. Wis. 2009).

Importantly, the WDTPA does not require reliance as an element of misrepresentation. The words "rely," "relied," and "reliance" appear nowhere in the text of either § 100.18(1) or § 100.18(11)(b)2. Rather, § 100.18(11)(b) provides that "any person suffering pecuniary loss because of a violation of this section by any

other person may sue in any court of competent jurisdiction . . . ." *Id.*; *see Novell v. Migliaccio*, 2008 WI 44 (2008) ¶¶ 28–29, 309 Wis. 2d 132, 144–45; *K & S Tool & Die Corp. v. Perfection Mach. Sales, Inc.*, 301 Wis. 2d 109, 129 (2007) ("Unlike common law misrepresentations, reasonable reliance is not the standard for a DTPA claim because the legislature created a distinct cause of action.").

First, Ms. McGrath sufficiently pleads that the Defendant-Appellee made a representation to 'the public' with the intent to induce an obligation. *AC at* ¶ 19 (setting forth misrepresentations to lawmakers and the public including YouTube's Guidelines and Policies); *See supra*, 42-44.

Second, Ms. McGrath pleads that the representation was 'untrue, deceptive, or misleading. ¶ 20, 25. *See supra*, 42-44. Defendants-Appellees' statements are untrue, deceptive, and misleading and meant to induce obligation. "[T]he statute is disjunctive, prohibiting 'untrue, deceptive or misleading' representations," meaning that Plaintiffs-Appellants need only prove the statement is one of the "three categories." *Blitz v. Monsanto Co.*, 317 F. Supp. 3d 1042, 1052 (W.D. Wis. 2018). Here, as previously stated, the studies show that the Defendants-Appellees' statements regarding their reviewing and reporting are untrue, as "[c]ontent that violates [their] Community Guidelines" was not removed from YouTube. ER-159-60 (AC ¶ 19). Furthermore, these statements mislead Ms. McGrath to think her reports would be handled properly according to the Guidelines, when that was not

the case. *See Blitz*, 317 F. Supp. 3d at 1053 n.8 (citing *Mislead*, Black's Law Dictionary (10th ed. 2014)). As alleged, YouTube made these representations to "upkeep a pretense of safety" to encourage reporting and users joining or remaining on the platforms. ER-159-60, 178, 182, 200 (AC ¶¶ 19, 105, 119, 215). YouTube was motivated to induce users with alleged untrue, deceptive, and misleading representations to further monetize their activities on the platforms through advertisements. ER-200 (AC ¶ 215).

Third, while the District Court correctly "assumed . . . McGrath has adequately plead[ed] she suffered a pecuniary loss." (ER-25), it erred in holding that Ms. McGrath failed to connect her losses to Defendants-Appellees' misrepresentations. *See supra*, 42-44. In the Amended Complaint, the Plaintiff-Appellant Annie McGrath specifically refers to quotes from the documents and webpages of YouTube's Policies ER-174 (AC ¶¶ 83, 86) and alleges those misrepresentations caused her pecuniary harm. ER-174, 201 (AC ¶¶ 86, 224).

To determine material causation, Wisconsin courts require that a defendant's misrepresentation was "a significant factor contributing to (plaintiff)'s decision" that caused the loss. *Novell*, 309 Wis. 2d at 152 n.3. As alleged and discussed above, Ms. McGrath "relied upon TikTok and YouTube's promise[s]" and "took the role of reporting harmful contents." ER-162 (AC ¶ 27). If it were not for the Defendants-Appellees' representations, she would not have taken on this role to report content

in the hopes of protecting other children on YouTube. The Court should not factor "reasonable reliance" into causation because the decision whether to even consider "reasonable reliance" rests with the jury. *K & S Tool*, 301 Wis. 2d at 129. YouTube's misrepresentations led her to "suffer monetary loss, emotional distress, and other forms of harms . . . in part caused by the [YouTube's] repeated dismissal and invalidation when [the reporting tools] failed to review the harmful contents against their Community Guidelines." ER-201 (AC ¶ 224). It is plausible that she would not have missed work and suffered damages if not for the Defendants-Appellees' representations as they need not be the "sole or only motivation" for Ms. McGrath's actions. *Id.*; *see K & S Tool*, 301 Wis. 2d at 130. As it is "plausible on its face" the question is whether the representations were a "but for" cause of the Ms. McGrath's pecuniary losses is for the jury. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, at 570 (2007). Thus, Ms. McGrath's claims under the WTDPA were well-pleaded.

***(c)*** *Oregon Unlawful Trade Practices Act (Claim 7)*

The District Court erred in finding that "Ms. Doe does not allege an actionable misrepresentation or an ascertainable loss of money or property" under the Oregon Unlawful Trade Practices Act (OUTPA). ER-161 (AC ¶ 22). OUTPA requires a plaintiff to prove that: (1) the defendant committed an unlawful trade practice; (2) the plaintiff suffered an ascertainable loss of money or property; and (3) the plaintiff's loss was the result of the unlawful trade practice. *Id.* The OUTPA "is to

be interpreted liberally as a protection to consumers." Or. Rev. Stat. Ann. 646.605–.656 (West); *see Denson v. Ron Tonkin Gran Turismo, Inc.*, 279 Ore. 85, 90 n 4 (1977).

Ms. Doe alleged actionable misrepresentation under OUTPA which is broadly defined as "any manifestation of any assertion by words or conduct, including, but not limited to, a failure to disclose a fact." ORS 646.608(2). Whether a misrepresentation exists may be determined through "affirmative indirect or circumstantial evidence." *Providence Health & Servs.-Oregon v. Mancuso*, 323 Ore. App. 573, 581 (2023). The misrepresentation provisions cover factual allegations about the nature of a product, including its "characteristics, ingredients, uses, benefits, quantities or qualities." ORS 646.608(1)(e). In *State ex rel. Rosenblum v. Johnson & Johnson*, the undisclosed risk of a product's inefficacy constituted an actionable misrepresentation under OUTPA because it would have borne on consumers' purchasing decisions. *State ex rel. Rosenblum v. Johnson & Johnson,* 275 Or. App. 23, 30–31 (2015).

The District Court incorrectly found that Ms. Doe did "not identify any particular representations on which she relied." ER-161 (AC ¶ 22). Ms. Doe alleged specific and actionable misrepresentations. Relying on TikTok's public representations regarding their reporting tools, Ms. Doe reported content for bullying and child safety reasons. ER-175, 177 (AC ¶¶ 90–92, 102) (stating that Ms. Doe felt

"deceived by TikTok's numerous statements to the public about its commitment to respond to reports by users regarding harms that spawn on its platform."). These public statements were clearly alleged in the Amended Complaint. ER-159-60 (AC ¶ 19) (quoting TikTok Guidelines detailing disallowed content; TikTok's #safertogether campaign promising that every report is checked; TikTok's Safety Page asking users to report potentially harmful content for review). As discussed above, these statements concerned the characteristics and qualities of TikTok's reporting tools. TikTok's Guidelines, public statements, and campaigns led users to believe that certain content was categorically not allowed on the platform and that every report would be reviewed. ER-159-60, 181-82 (AC ¶¶ 19, 118–19). Had Ms. Doe known of the defects in the quality of TikTok's reporting tools, this awareness would have "negatively affect[ed] [its] monetary value and commercial attractiveness," and she would have directed her efforts elsewhere. *Johnson & Johnson*, 275 Or. App. At 31. TikTok's statements about the functionality and capability of its reporting tools were actionable misrepresentations under OUTPA.

Moreover, the District Court's erred in finding that Ms. Doe did not allege an ascertainable loss of money. ER-26. Under OUTPA, a private litigant must plausibly allege "an ascertainable loss of money or property." ORS § 646.638(1). While the statute itself does not explicitly require reliance, its phrasing "effectively requires that the unlawful trade practice cause the ascertainable loss." *Bohr v. Tillamook*, 373

Or. 343, 359 (2025). To qualify as ascertainable, a loss must be "objectively verifiable" and "specifically of 'money or property.'" *Pearson v. Philip Morris, Inc.*, 358 Or. 88, 117, 126 (Or. 2015) (holding that reliance on the misrepresentations "'connect[ed] the dots' to provide the key causal link between the misrepresentation and the loss"). Under the reliance and causation framework used in *Pearson v. Philip Morris, Inc.*, Ms. Doe utilized TikTok based on Defendants-Appellees' representations regarding the quality of the platform's reporting tools. *Id.* at 126; ER-175 (AC ¶¶ 90–92). This usage resulted in "lost time and resources because of the futile efforts she made using [TikTok's] reporting tools." ER-202-3 (AC ¶ 233).

Ms. Doe properly alleged loss of time and resources, which can be quantified with proper evidentiary resources. She alleged that TikTok profited off her "timed engagement" and the collection of her data for use in advertising. ER-200 (AC ¶ 215). The value of a digital user's engagement and information is quantifiable, measurable, and objectively verifiable. *See In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589 (9th Cir. 2020) ("Plaintiffs allege that their browsing histories carry financial value. . . [based on] the existence of a study that values users' browsing histories at $52 per year, as well as research panels that pay participants for access to their browsing histories. Plaintiffs also sufficiently allege that Facebook profited from this valuable data."). Accordingly, this Court should find that Ms. Doe's OUTPA claims are actionable.

***(d)*** *UCL - California Business & Professions Code §§ 17200 & 17500 (Claim 8)*

To establish a claim under UCL or FAL, a plaintiff must "(1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., economic injury, and (2) show that that economic injury was the result of, i.e., caused by, the unfair business practice or false advertising that is the gravamen of the claim." *Kwikset Corp. v. Superior Ct.*, 51 Cal. 4th 310, 322 (Cal. 2011). First, the District Court erred in finding that Plaintiffs-Appellants have not pled reliance on actionable misrepresentations. We refer this Court to the thorough analysis addressing this topic in the Common Law misrepresentation claims. *See supra*, 37-44. Second, District Court erroneously found that Plaintiffs-Appellants lack standing because they failed to allege an economic injury caused by the misrepresentations. ER-27–28.

However, Plaintiffs-Appellants plausibly allege economic harms from the (1) loss of bargain, and (2) diminution of the value of their data which can be proven through the evidentiary stages of litigation.

First, "[c]ourts in California have consistently held that benefit of the bargain damages represents economic injury for purposes of the UCL." *Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024, 1054 (S.D. Cal. 2023) (quoting *In re Solara Med. Supplies, LLC Customer Data Sec. Breach Litig.*, 613 F.Supp.3d 1284, 1301 (S.D. Cal. 2020)). "[A] benefit of the bargain measure of damages is intended 'to

give the injured party the benefit of his bargain and, insofar as possible, to place him in the same position he would have been in had the promisor performed the contract.'" *In re Google Assistant Priv. Litig.*, 546 F. Supp. 3d 945, 966 (N.D. Cal. 2021). "[T]he Ninth Circuit and a number of district courts . . . have [increasingly] concluded that plaintiffs who suffered a loss of their personal information suffered economic injury and had standing [to assert a UCL claim]." *In re TikTok, Inc., Minor Priv. Litig.*, No. MDL 3144-GW-RAOX, 2025 WL 3628598, at *19 (C.D. Cal. Nov. 5, 2025) (quoting *Calhoun v. Google LLC,* 526 F. Supp. 3d 605, 636 (N.D. Cal. 2021) (collecting cases)).

Here, Plaintiffs-Appellants entered into a contract by exchanging their valuable engagement and data for the use of the Defendants-Appellees' platform. ER-200 (AC ¶ 215). Plaintiffs-Appellants are parents of children who were harmed by the choking challenge videos and illicit drug sales on Defendants-Appellees' platforms. ER-163 (AC ¶ 30). Given that Plaintiffs-Appellants were using Defendants-Appellees' reporting tools as a "form of advocacy" (AC at ¶ 8), it is plausibly inferred that had they "known the truth about Defendants," would not have used the product in the same way or at all. *See In re Marriott Intl., Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, at 462 (D. Md. 2020). Through transactions, Plaintiffs-Appellants "provided valuable data to Google and [TikTok] and ha[d] received no money in return" and experienced diminished future property

interest in data. *Brown v. Google LLC*, No. 20-cv-03664-LHK, 2021 WL 6064009, at *17 (N.D. Cal. Dec. 22, 2021). Alleged here, Plaintiffs-Appellants experienced none of the expected value from the bargain as the reporting tool "was not capable of conducting a review of the user reports and the videos that were reported." ER-155-6 (AC ¶ 9). Instead, Plaintiffs-Appellants were worse off having experienced the diminished future property interest in data. *See In re Experian Data Breach Litig.*, No. SACV 15-1592 AG (DFMX), 2016 WL 7973595, at *5 (C.D. Cal. Dec. 29, 2016) ("[A] growing number of federal courts have now recognized Loss of Value of PII as a viable damages theory.") (quoting *In re Anthem, Inc. Data Breach Litig.*, No. 15-MD-02617-LHK, 2016 WL 3029783, at *43 (N.D. Cal. May 27, 2016)); *see also In re Marriott Intl., Inc.,* 440 F. Supp. 3d at 462 ("Neither should the Court ignore what common sense compels it to acknowledge – the value that personal identifying information has in our increasingly digital economy. . . . Consumers too recognize the value of their personal information and offer it in exchange for goods and services."). While "[c]ourts are split as to whether plaintiffs must have paid money to a defendant to sustain their benefit of the bargain theory," the Court should remand this case for an examination of the materiality and discovery. *In re TikTok, Inc., Minor Priv. Litig.,* 2025 WL 3628598, at *21 (citing *Greenley*, 684 F. Supp. 3d at 1055 (collecting cases)).

Plaintiffs-Appellants may also allege diminution of the value of their data as a separate harm. *Id.* By signing up for the platforms, Defendants-Appellees monetized their data, leading to it having less value in other circumstances. *Brown v. Google LLC*, 2021 WL 6064009, at *17 (holding that plaintiffs allege two plausible theories of economic injury – first, Google induced plaintiffs to give Google their data without payment, and second, Google diminished plaintiffs' future property interest in data by selling it to advertisers). Data is an asset that is sold in a number of circumstances. See *supra* 48-49, 57 (consumer data as an asset as discussed in IDCSA and OUTPA). In Chapter 11 Bankruptcy, customer data is increasingly considered an asset in bankruptcy asset sales. *See supra* 48-49, 57. By reducing the marketability of their data through monetization, Defendants-Appellees caused Plaintiffs-Appellants to experience a monetary loss.

As analyzed in the California Common Law Misrepresentation section, Plaintiffs-Appellants sufficiently alleged that the misrepresentations caused them to suffer monetary loss. *See supra* 37-44.

**D. The District Court Erred in Finding that the First Amendment Bars Certain Claims**

The District Court erred in concluding that certain claims are barred by the First Amendment because they allegedly "seek to hold Defendants liable for their expressive activity, i.e., Defendants' content moderation decisions." ER-37. As scrupulously explained (*supra* 22-32) Plaintiffs-Appellants' claims are content-

agnostic: they neither compel Defendant-Appellees' to adopt specific viewpoints nor restrict Defendant-Appellees' ability to moderate or curate user content. Instead, they challenge Defendant-Appellees' affirmative, voluntary misrepresentations about their own functionality and Defendant-Appellees' negligent design of product features, both of which regulate deceptive conduct and product design, not protected expression.

Courts have repeatedly rejected attempts by social media companies to invoke the First Amendment to shield claims challenging product design rather than publication decisions. Most recently, in *Snap, Inc. v. Eighth Judicial District Court in & for County of Clark*, the Nevada Supreme Court held that First Amendment protections did not bar negligence claims alleging that Snap designed features that harmed young users. *Snap, Inc. v. Eighth Judicial District Court in & for County of Clark* , 584 P.3d 771 (Nev. 2026). The court explained that the complaint did not seek to punish Snap for its speech or publication decisions, nor did it compel speech; rather, it referenced Snap's features only to provide context for claims that Snap negligently designed its app. *Id.* The court therefore concluded that the First Amendment "did not preclude the State's negligence claim," emphasizing that the claims regulated conduct, not expression. *Id.*

The same logic applies here. Plaintiffs-Appellants do not seek to regulate Defendants-Appellees' editorial judgments or compel changes to user-generated

content. They instead challenge Defendants-Appellees' false assurances about their reporting tools and the defective design of content-agnostic product features that induced users to rely on those assurances, conduct squarely outside the First Amendment's core protections.

Moreover, Plaintiffs-Appellants' claims independently rest on misleading commercial representations, which are not protected speech. The Supreme Court has long held that false or deceptive commercial speech may be prohibited outright. *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S. 748, 771–73 (1976). To receive any constitutional protection, commercial speech must concern lawful activity and must not be misleading. *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 563–64 (1980). The Constitution does not shield fraud or misrepresentation merely because it is conveyed through speech. *See Ill. ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 612 (2003) ("[T]he First Amendment does not shield fraud").

Finally, even if First Amendment scrutiny applied, Defendants-Appellees' statements would constitute commercial speech entitled only to diminished constitutional protection. Here, Plaintiffs-Appellants challenge voluntary, misleading representations about the functionality and safety of Defendants-Appellees' reporting tools—statements made to induce user reliance and engagement. Regulation of such deceptive conduct falls squarely within the

government's traditional authority and easily satisfies any applicable First Amendment standard. *See Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 638 (1985) (stating the First Amendment does not prevent regulation of misleading commercial speech).

## VIII. CONCLUSION

This Court should reverse the District Court's dismissal and hold that Plaintiffs-Appellants have adequately pleaded claims, and remand the case for further proceedings.

Dated: April 23, 2026

Respectfully Submitted,

By: /s/ Juyoun Han

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 26-246

I am the attorney or self-represented party.

**This brief contains** 13,921 **words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

- [x] complies with the word limit of Cir. R. 32-1.
- [ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
- [ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
- [ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.
- [ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  - [ ] it is a joint brief submitted by separately represented parties.
  - [ ] a party or parties are filing a single brief in response to multiple briefs.
  - [ ] a party or parties are filing a single brief in response to a longer joint brief.
- [ ] complies with the length limit designated by court order dated ____________.
- [ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ Juyoun Han **Date** 04/23/2026
*(use "s/[typed name]" to sign electronically-filed documents)*

## CERTIFICATE OF SERVICE

I, Juyoun Han, a member of the Bar of this Court, hereby certify that on April 23, 2026 I caused to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system the following document. APPELLANTS' OPENING BRIEF.

## CERTIFICATE OF CM/ECF SERVICE

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: April 23, 2026

By: /s/ Juyoun Han