**No. 26-246**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

---

JOANNE BOGARD; ANNIE MCGRATH; JANE DOE;
BECCA SCHMILL FOUNDATION

*Plaintiffs-Appellants*,

v.

ALPHABET INC.; XXVI HOLDINGS INC; GOOGLE LLC;
YOUTUBE LLC; BYTEDANCE, INC.; TIKTOK INC.,

*Defendant-Appellee*.

On Appeal from the United States District Court
for the Northern District of California
No. 5:24-CV-03131-VKD
Hon. Virgina K. DeMarchi

---

**APPELLANTS' REPLY BRIEF**

---

JUYOUN HAN
EISENBERG & BAUM, LLP
24 Union Square East, Penthouse
New York, New York 10003
917 935-0251
*jhan@eandblaw.com*

*Attorney for Plaintiffs-Appellants*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ... iv

INTRODUCTION ... 1

ARGUMENTS ... 2

I. SECTION 230 IMMNUITY DOES NOT APPLY ... 2

A. Appellee's Foundational Error is Recasting its Reporting-Infrastructure Defects as Appellants' Disagreement with Moderation Outcomes ... 2

B. Section 230 Does Not Bar Products Liability Claims ... 4

C. Section 230 Does Not Bar Negligence Claims ... 10

D. Section 230 Does Not Bar Fraud-Based Claims ... 10

II. APPELLEES' FIRST AMENDMENT DEFENSE FAILS BECAUSE THE CLAIMS CHALLENGE APPELLEES' OWN CONDUCT, NOT PROTECTED EDITORIAL JUDGMENT ... 12

III. APPELLANTS ADEQUATELY PLEADED THE ESSENTIAL ELEMENTS OF THEIR CLAIMS ... 16

A. Count I Strict Products Liability Claims were Adequately Pleaded ... 16

1. Report Tools Are Products ... 16

2. Appellants Adequately Pleaded Injury and Causation ... 20

B. Count II Negligence is Properly Alleged ... 22

C. Misrepresentation Claims Are Adequately Pleaded ... 23

1. Common Law Misrepresentation Claims ... 23

i. Actionable ... 23

ii. False ... 24

iii. Reliance ... 25

2. State Statutory Claims ... 26

i. Indiana ..... 26
ii. Wisconsin ..... 29
iii. Oregon ..... 30
iv. California ..... 30
D. Proximate Causation ..... 32
E. Foundation Established Standing ..... 32
CONCLUSION ..... 34
STATEMENT OF RELATED CASES ..... 35
CERTIFICATE OF COMPLIANCE ..... 36
CERTIFICATE OF SERVICE ..... 37

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Airs Aromatics, LLC v. Victoria's Secret Stores Brand Management, Inc.*,
744 F.3d 595 (9th Cir. 2014) ........................................................ 29

*Bank v. Huizar,*
178 N.E.3d 326 (Ind.App., 2021) .................................................. 28, 29

*Barnes v. Yahoo!, Inc*.,
570 F.3d 1096 (9th Cir. 2009) ................................................. 8, 11, 24

*Bolger v. Youngs Drug Prods. Corp.*,
463 U.S. 60 (1983) ........................................................................ 16

*Bride v. Yolo Techs.,*
112 F.4th 1168 (9th Cir. 2024). ............................................. 7, 8, 11, 24

*Brown v. Google LLC,*
2021 WL 6064009 (N.D. Cal. Dec. 22, 2021). ........................................ 31

*Calise v. Meta Platforms, Inc*.,
103 F.4th 732 (9th Cir. 2024) ........................................................... 8

*Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*,
447 U.S. 557 (1980) ....................................................................... 16

*Clark v. Eddie Bauer LLC*,
371 Or. 177 (Or., 2023) ................................................................. 30

*Doe v. Grindr, Inc.,*
128 F.4th 1148 (9th Cir. 2025) ............................................... 7, 23, 24

*Doe v. Internet Brands, Inc.,*
824 F.3d 846 (9th Cir. 2016) ...........................................................11

*Doe 1 v. Meta Platforms, Inc.*,
174 F.4th 1159 (9th Cir. 2026) .................................................................. 6, 7, 20

*Doe 1 v. Twitter, Inc.*,
148 F.4th 635 (9th Cir. 2025) ............................................................ 5, 6, 7, 9, 23

*East Bay Sanctuary Covenant v. Biden*,
993 F.3d 640 (9th Cir. 2021) ............................................................................ 33

*Fogelstrom v. Lamps Plus, Inc.*,
195 Cal. App. 4th 986 (2011) ............................................................................ 31

*Garcia v. Character Techs., Inc.*,
No. 6:24-cv-1903-ACC-UAM, slip op. at 36 (M.D. Fla. May 21, 2025) ........... 18

*Havens Realty Corp. v. Coleman,*
455 U.S. 363 (1982) ........................................................................................... 33

*HomeAway.com, Inc. v. City of Santa Monica*,
918 F.3d 676 (9th Cir. 2019) ........................................................................5, 11

*Hughes v. Apple Inc.*,
723 F. Supp. 3d 693 (N.D. Cal. 2024) .............................................................. 17

*Hoosier Contractors, LLC v. Gardner*,
190 N.E.3d 359 (Ind.App., 2022) ...................................................................... 27

*In re Actiq Sales and Marketing Practices Litigation*,
790 F.Supp.2d 313 (E.D. Pa., 2011) .................................................................. 28

*In re Facebook Inc. Internet Tracking Litigation*,
956 F.3d 589 (9th Cir. 2020) ............................................................................. 30

*In re Social Media Adolescent Addiction Personal Injury Products Liability Litigation,*
777 F. Supp. 3d 1016 (N.D. Cal. 2025) ............................................................. 18

*In re Uber Technologies, Inc., Passenger Sexual Assault Litigation,*
745 F. Supp. 3d 869 (N.D. Cal. 2024) ............................................................... 17

*Jacobs v. Meta Platforms, Inc.*,
2023 WL 2655586 (Cal. Super. Ct. Mar. 10, 2023) ........................................... 19

*Kearns v. Ford Motor Co.,*
567 F.3d 1120 (9th Cir. 2009). .............................................................................. 26

*Lemmon v. Snap, Inc.,*
995 F.3d 1085 (9th Cir. 2021). ................................................................................ 8

*Madigan v. Telemarketing Assocs., Inc.,*
538 U.S. 600 (2003) ............................................................................................... 14

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024) ............................................................................................... 13

*Orr v. Plumb*,
884 F.3d 923 (9th Cir. 2018) ................................................................................. 31

*Pierson v. Sharp Mem'l Hosp., Inc.,*
216 Cal. App. 3d 340 (1989) .................................................................................. 19

*Pearson v. Philip Morris, Inc.,*
358 Or. 88 (Or. 2015) ............................................................................................. 30

*Snap, Inc. v. Eighth Jud. Dist. Ct.,*
584 P.3d 771 (Nev. 2026)........................................................................................ 13

*Social Media Cases,*
2023 WL 6847378 (Cal. Super. Ct. Oct. 13, 2023)....................................... 19, 21

*Social Media Cases*,
2025 WL 3207660 .................................................................................................. 21

*Standing Committee on Discipline of U.S. District Court for the Central District of California v. Yagman,*
55 F.3d 1430 (9th Cir. 1995) ................................................................................. 14

*State v. TikTok Inc.*,
245 N.E.3d at 686 (Ind. Ct. App. 2024) ........................................................ 24, 27

*TikTok, Inc. v. Eighth Jud. Dist. Ct. in & for Cnty. of Clark*,
578 P.3d 640 (2025) .......... 24

*T.V. v. Grindr LLC,*
2024 WL 4128796 (M.D. Fla. Aug. 13, 2024).......... 18

*Winter v. G.P. Putnam's Sons,*
938 F.2d 1033 (9th Cir. 1991). .......... 19

*X Corp. v. Bonta*,
116 F.4th 888 (9th Cir. 2024) .......... 14, 15

**Statutes**

Ind. Code § 24-5-0.5-4(a) .......... 28

**Rules and Regulations**

Fed. R. Civ. P. 9(b) .......... 26

**Other Authorities**

Restatement (Second) of Torts § 402A (1965) .......... 18

## INTRODUCTION

Appellees designed reporting tools, invited users to report harmful videos through them, and represented that every report would be checked and reviewed against their own Community Guidelines. ER-159-60 (AC ¶ 19). May Appellees be held accountable when the tools they designed cannot perform the function represented? And may they be held to the representations they made about those tools? This Court should answer yes. The case concerns three things: (1) design defects at each stage of Appellees' reporting tool; (2) Appellees' own affirmative representations about that tool; and (3) the injuries flowing from users' reliance on those representations and from the defects themselves. Because every duty runs to Appellees' own conduct, this framework of liability does not implicate Section 230.

Appellees' answering brief recasts every claim as a challenge to content moderation, announcing that all eight counts are "premised on Defendants' alleged failure to perfectly moderate third-party content to Plaintiffs' subjective specifications." AB 24. This foundational error also belies the District Court's dismissal. That harmful videos are rampant on YouTube and TikTok is not the defect per se; they are evidence that the reporting tool was defective. The reported videos are relevant because they reveal how the reporting system actually operated: no-violation determinations on reports involving content that plainly appeared to

violate Appellees' own policies, at rates exceeding ninety-five percent, ER-161-62, 186-87 (AC ¶¶ 21, 26, 136-140); arbitrary and contradictory outputs, ER-156 (AC ¶ 11); and instances in which the same content treated differently once it reached Appellees through another channel, ER-161, 176, 186-87 (AC ¶¶ 24, 97-98, 138). None of that asks a court to decide whether any particular video should be removed. This Court should reverse because the District Court accepted Appellees' reframing instead of applying the required duty analysis to the claims actually pleaded.

Appellees' brief repeats this foundational error in its First Amendment defense. Their arguments regarding the merits of the claims are fraught with premature determinations of fact and misplaced citation to authorities as fully discussed below.

## ARGUMENTS

## I. SECTION 230 IMMUNITY DOES NOT APPLY

### A. Appellees' Foundational Error is Recasting its Reporting-Infrastructure Defects as Appellants' Disagreement with Moderation Outcomes.

Appellees' premise is that Appellants' claims "depend[] on whether Plaintiffs agree with Defendants' content moderation decisions," and that "[t]here is only a 'flaw' in Defendants' reporting tools if Plaintiffs disagree with

Defendants' ultimate decision." AB 26-27. That premise mischaracterizes the Amended Complaint and is the foundational error.

Appellees' reporting infrastructure defects are demonstrated by internally inconsistent determinations regarding the same video content, not by disagreement with Appellants' determinations. Jane Doe's experience is the clearest illustration. In May 2022, a family acquaintance reported a video targeting her son for bullying and TikTok's automated response stated that it did not violate the Community Guidelines. ER-175 (AC ¶¶ 89-91). Ms. Doe reported the same video herself, and TikTok again deemed it non-violative. ER-175 (AC ¶¶ 92-93). The reporting process offered no means to escalate the determination to a human reviewer. ER-175 (AC ¶ 94). Two days later, through a third-party contact, Ms. Doe brought the same video directly to TikTok's executives and asked whether it violated the Guidelines. TikTok's Minor Safety Team then answered the video "violates our Community Guidelines." ER-176 (AC ¶ 97). TikTok never explained the internal discrepancy. ER-176 (AC ¶ 98).

The pattern occurred at YouTube, where content deemed non-violative by the reporting tool was deemed violative of the guidelines once a journalist raised it directly to the company's representative. ER-161, 186-87 (AC ¶¶ 24, 138).

Similarly, every video identified in the Amended Complaint, each of which the reporting tools had determined was non-violative, was suddenly deemed

violative and removed once this suit was filed and referenced the videos. ER-170 (AC ¶ 66 & nn.15-16); ER-173 (AC ¶ 81 & n.17).

The Complaint expressly stated that "Defendants' failure to remove content is not at the core of this complaint . . . Plaintiffs are asserting claims about the defects inherent in the Defendants' reporting tools that were offered to users" ER-155 (AC ¶ 9)

The allegation that more than 95% of the reported videos plainly violating platform policies were deemed non-violative ER-161 (AC ¶ 23) is therefore evidence of a malfunction, not a tally of moderation decisions Appellants ask this Court to reverse. ER-161 (AC ¶ 23). A plaintiff alleging a broken thermometer must point to its readings; doing so does not transform the claim into a dispute over whether the room was cold. Likewise, inconsistent reporting outputs demonstrate the alleged defect without requiring judicial determination of the proper moderation result.

**B. Section 230 Does Not Bar Products Liability Claims**

Section 230 does not bar products liability (design defect claims) based on reporting infrastructure defects. This Court recently held a "purported duty to cure reporting infrastructure deficiencies" falls outside Section 230 because a platform "could fulfill" that duty "without monitoring, removing, or in any way engaging with third-party content," and that the duty survives "even if that legal duty 'might

lead a company to respond with monitoring or other publication activities.'" *Doe 1 v. Twitter, Inc.*, 148 F.4th 635, 645 (9th Cir. 2025) (quoting *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 682 (9th Cir. 2019)). The reporting infrastructure defects in *Twitter* included: a user could not use the "easily-accessible" general report function but had to locate a separate form; the form did not permit reporting content sent by private message; it required an email address; and it required the reporter to have and be logged into an account. *Id.* Notably, the plaintiffs in *Twitter* successfully reported the content. Doe #1 filed through Twitter's content-reporting interface, provided the information Twitter requested, received an automated response, and was ultimately told Twitter had reviewed the posts, found no policy violations, and would take no further action. *Id.* at 641. The material was later removed only after intervention by the Department of Homeland Security. *Id.*

Appellees respond only that "[n]othing remotely similar is alleged here." AB 31. Yet, the reporting infrastructure defects here closely resemble those in *Doe 1 v. Twitter*. *See id.* First, TikTok requires sign-up and log-in before reporting, ER-180 (AC ¶ 112); buries the report button "in a three dotted button in the corner of the video or within the 'share' button"; and lacks an appeal process. ER-180 (AC ¶ 113-18). YouTube requires a Google account, provides confusing categories, lacks meaningful tracking, and provides no appeal process. ER-170-71 (AC ¶ 67);

provides reporting users no meaningful response, status updates, explanation, human review, or appeal. ER-184 (AC ¶¶ 126-127).

Account-gating, buried reporting functions, confusing categories, no tracking, and no appeal are precisely the kind of defects that *Doe 1 v. Twitter* found actionable. *See* 148 F.4th at 645 (9th Cir. 2025).

Appellees' remaining response is that Appellants "repeatedly and successfully made reports using that infrastructure," so no defect can exist. AB 29. That was equally true of the plaintiffs in *Doe 1*, and this Court held their claim actionable regardless.

Appellees devote one sentence to argue that defects in access to the reporting interface were not pleaded as part of Count I such that it was forfeited. AB 29 (citing ER-12 n.4). This is clearly wrong because Count I adopts and incorporates all preceding allegations including access and interface. ER-191 (AC ¶ 160).

Appellees' reliance on *Doe 1 v. Meta Platforms, Inc.*, 174 F.4th 1159 (9th Cir. 2026) does not change this result. The plaintiffs there alleged three purported design defects of Facebook: encouraging "extreme and polarizing content" and "amplification, and reporting interface available only in English. *Id.* at 1167. Relevant here is the Court's treatment of the reporting interface claim. This Court expressly declined to reach the merits of the claim because it had been forfeited

because plaintiffs had "mentioned the alleged English-language reporting issues only once in their opening brief" and "did not discuss the effect of Section 230 on their reporting infrastructure theory in their reply brief." *Id.* at 1167 n.4. *Meta Platforms* therefore does not contradict *Doe 1 v. Twitter* and  does not hold that reporting-infrastructure claims are barred by Section 230.

Appellees invoke *Doe v. Grindr Inc*. which does not apply here. *Grindr* involved a "duty to suppress matches and communications between adults and children" to prevent harmful communications between users, necessarily requiring Grindr "to monitor third-party content and prevent adult communications to minors." 128 F.4th 1148, 1153 (9th Cir. 2025). *Id.* The asserted duty therefore ran directly to facilitating communications between third parties. In contrast, here, the reporting tools are the interface through which users communicate with Appellees themselves. The alleged duties concern Appellees' own interface, review, tracking, appeal mechanisms, and representations. They do not require monitoring or suppressing third-party communications. ER-170-71, 175, 180-81, 184 (AC ¶¶ 67, 73, 94, 112-118, 126-127). Liability based on those duties does not depend on monitoring, suppressing, or altering any communication between third parties.

*Bride v. Yolo Techs.* also supports Appellants. The defective design theory there rested on the platform's facilitation of anonymous communication *between* users that made in dangerous. 112 F.4th 1168, 1179 (9th Cir. 2024). Here, the

reporting tools do not facilitate communication between users but focus on user's interaction with the reporting tool.

Appellees omit the portion of *Bride* most relevant here. The Court held that misrepresentation claims arising from YOLO's own promises to reveal-or-ban users that violate its policies were not barred because liability flowed from "the promise itself," rather than any publication decision. *Id.* at 1179. That holding supports the Appellants claims.

The controlling inquiry is the duty analysis set forth in *Calise* and *Barnes*. This Court asks (1) from what source the asserted duty arises and (2) what the duty would require the defendant to do. *Calise v. Meta Platforms, Inc.*, 103 F.4th 732, 742-43 (9th Cir. 2024); *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102-07 (9th Cir. 2009).

First, the duties alleged here arise from Appellees' roles as product designers and speakers of their own representations, not from their status as publishers. A manufacturer's duty arises from its "distinct capacity as a product designer." *Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1092 (9th Cir. 2021). Likewise, where a platform makes affirmative representations, liability flows from "the promise itself." *Bride*, 112 F.4th at 1179. The Amended Complaint alleges both duties. ER-193-94 (AC ¶¶ 177-178).

Second, discharging those duties would not require Appellees to monitor, remove, suppress, or otherwise engage with third-party content. Appellees could remove account-gating requirements, redesign reporting interfaces, provide intelligible reporting categories, implement meaningful review-and-response and tracking mechanisms, create an avenue to appeal no-violation determinations, or simply speak truthfully about the capabilities of their systems. The District Court itself recognized that the misrepresentation duty "can be fulfilled by changing their statements, without changing the way they moderate content." ER-36; see *Doe 1 v. Twitter,* 148 F.4th 635, 645 (9th Cir. 2025) ("purported duty to cure reporting infrastructure deficiencies" falls outside Section 230 because it can be discharged "without monitoring, removing, or in any way engaging with third-party content.")

The Amended Complaint expressly alleges remedies that require no content monitoring whatsoever. Count I alleges that Appellees "should have warned users that making reports does not lead to any meaningful review, or they should not have set forth such a defective reporting process at all." ER-192 (AC ¶ 167). Count II alleges that Appellees "could have developed a robust, safe, and democratic reporting/response system" or "could have not created a reporting tool at all and allowed users and other enforcement entities to handle crises." ER-194 (AC ¶ 181). A duty that may be satisfied by eliminating the reporting tool altogether is not a duty to publish, withdraw, review, or remove third-party content.

**C. Section 230 Does Not Bar Negligence Claims.**

Appellees repeat their foundational error by recasting Negligence Claims as a duty to "either remove content from their platforms or 'protect' users from inappropriate content." AB 32. But

Amended Complaint instead alleges different duties: first, a duty to exercise reasonable care in designing, maintaining, and distributing a product so as to avoid creating an unreasonable risk of harm; and second, a duty arising from Appellees' voluntary undertaking of the reporting-tool function, over which Appellees exercised exclusive control. ER-193-94 (AC ¶¶ 177-178). Discharging these duties does not require removing any particular video, deciding any particular report, or otherwise engaging with third-party content. As explained above, both duties may be discharged through content-neutral measures. ER-194 (AC ¶ 181).

**D. Section 230 Does Not Bar Fraud-Based Claims.**

Appellees again recast the theory alleged in the Amended Complaint as disagreement with moderation outcomes. AB 32-35. This reveals again the Appellees' foundational error.

The fraud claims concern whether Appellees accurately represented how their reporting operates. The Amended Complaint alleges that Appellees represented, among other things, that reports would be reviewed, checked against Community Guidelines, and acted upon through meaningful reporting processes,

when in practice the reporting infrastructure allegedly did not operate as represented. *See* ER-159-60 (AC ¶ 19-20).

*Barnes* and *Bride* foreclose Appellees' theory. *Barnes* held that liability arising from a defendant's own promise is not publisher liability because the duty arises from the promise itself. Likewise, *Bride* held that misrepresentation claims based upon a platform's own representations were not barred by Section 230 because liability flowed from "the promise itself."

Compliance with the duty alleged here does not require removal of a single item of content. Appellees could comply simply by speaking truthfully about the operation and limitations of their reporting systems. The District Court recognized precisely that point, holding that the relevant duty "can be fulfilled by changing their statements, without changing the way they moderate content." ER-36. That observation largely ends the Section 230 inquiry because a duty that may be discharged without engaging in publication activity does not treat a platform as a publisher. *See HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 682-83 (9th Cir. 2019) (rejecting Section 230 immunity where the challenged obligation could be satisfied without changes to user content, notwithstanding a platform's assertion that content removal would be the most practical compliance option); *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 851 (9th Cir. 2016) (duty-to-warn claim not barred because it would not require the defendant to remove user content

or otherwise affect how it published such content). Appellees insist that "the only way for Defendants to satisfy Plaintiffs' asserted duty is to review reported videos and determine that they violate Defendants' policies." AB 28. The District Court, having considered the same duty, concluded otherwise.

Notably, Appellees ask this Court to go further than the District Court and immunize the "review and remove" statements that the District Court found actionable. AB 34 n.4. No cross-appeal supports expanding the judgment on that basis.

## II. APPELLEES' FIRST AMENDMENT DEFENSE FAILS BECAUSE THE CLAIMS CHALLENGE APPELLEES' OWN CONDUCT, NOT PROTECTED EDITORIAL JUDGMENT.

Appellees' First Amendment defense repeats the same foundational error that infects their Section 230 defense. They characterize this case as a dispute over whether particular videos violated Appellees' Community Guidelines. AB 35-38. It is not. This case challenges Appellees' own conduct: the defective design of reporting tools and their own representations.

Appellees voluntarily created the Community Guidelines and represented that reports would be reviewed against the guidelines. ER-159-60 (AC ¶¶ 19-20). Appellants do not challenge which guidelines should be imposed over what content; they challenge Appellees' negligent product engineering and Appellees' own false factual assertions. Opening Br. 61. Appellees do not answer that

argument. Instead, they divert all claims to be based on "general statements about the inherently subjective inquiry into whether certain content violates Defendants' guidelines." AB 36. Yet the internal inconsistencies between the reporting tool determinations and Appellees' own reviewers and representatives foreclose their argument. ER-175-76, 186-87 (AC ¶¶ 88-98, 136-40). That internal discrepancy is evidence of malfunction, not a request for judicial control over speech.

Nor would liability here compel Appellees to restrict expression. A judgment requiring Appellees to design functioning reporting infrastructure, provide accurate information about that infrastructure, or stop making false assurances would regulate Appellees' own conduct and deception. Courts have accordingly rejected attempts by social media companies to convert product-design claims into First Amendment disputes. *See Snap, Inc. v. Eighth Jud. Dist. Ct.*, 584 P.3d 771 (Nev. 2026).

Appellees' reliance on *Moody v. NetChoice, LLC* is therefore misplaced. *Moody* concerned state laws that restricted platforms' editorial choices in curating third-party speech on feeds, laws that limited platforms' ability "to filter, prioritize, and label" user content and, in the Texas application discussed by the Court, prevented platforms from using their moderation standards "to remove, alter, organize, prioritize, or disclaim posts" in Facebook's News Feed or YouTube's homepage. *Moody v. NetChoice, LLC*, 603 U.S. 707, 717-18 (2024). This case

presents no comparable state mandate. Appellants do not seek a rule requiring Appellees to carry disfavored speech, remove lawful speech, or alter their editorial policies. They seek accountability for Appellees' own defective reporting systems and their own representations about those systems.

*Standing Committee on Discipline of U.S. District Court for the Central District of California v. Yagman*, 55 F.3d 1430 (9th Cir. 1995) does not advance Appellees' position. *Yagman* protected opinions and rhetorical hyperbole, but it reaffirmed that statements implying objectively verifiable facts receive no protection if false. *Id.* at 1438-41. Here, the statement concern objectively testable facts about Appellees' own reporting systems—whether reports are reviewed, checked against Guidelines, and handled through the reporting tool as represented. Those assertions can be tested against how the systems actually operated. And if, as pleaded, they were false or misleading, the First Amendment supplies no immunity. See *Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 612 (2003) ("the First Amendment does not shield fraud").

Appellees' reliance on *X Corp. v. Bonta* is likewise inapt. That case involved government-compelled disclosures concerning platforms' content-moderation policies and definitions of controversial categories. *X Corp. v. Bonta*, 116 F.4th 888, 896-97 (9th Cir. 2024). The Ninth Circuit held that those reporting requirements likely compelled noncommercial speech because they required

platforms to reveal their policy views concerning controversial categories of content and how those categories should be regulated on their services. *Id.* at 901-03.

Nothing in *X Corp.* holds that a platform's voluntary marketing campaigns, in-product safety assurances, or user-facing representations made to attract, retain, and engage users are immune from ordinary fraud and consumer-protection law.

Appellees quote *X Corp.* for the proposition that a platform's terms of service, including processes for flagging content and potential actions taken with respect to flagged content, do not satisfy the "usual definition" of commercial speech. AB 37. But that statement cannot be divorced from its context. The court was evaluating compelled reports submitted to the government regarding platforms' content-moderation policies and practices. See *X Corp.*, 116 F.4th at 896-97, 901-03. The court held that those reports were not commercial speech because they conveyed the platform's views about how controversial categories of content should be defined and moderated. *Id.* at 902-03.

Here, Appellants seek nothing comparable to compelled government disclosure. Appellants challenge voluntary representations Appellees made to users about their own products and services. Those statements were directed to consumers, concerned Appellees' own products and services, and were made in

connection with Appellees' effort to attract, retain, and engage users. See ER-200 (AC ¶ 215).

Under *Bolger*, the challenged campaign and product statements qualify as commercial speech: they concern Appellees' own reporting and safety features, were promotional, and were economically motivated to gain user retention and engagement. See ER-200 (AC ¶ 215); *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66-67 (1983) (finding commercial speech where the communications were advertisements, referred to the speaker's products, and were economically motivated). Furthermore, false or misleading commercial speech receives no First Amendment protection. *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 563-64 (1980); see also *Bolger*, 463 U.S. at 69 ("The State may deal effectively with false, deceptive, or misleading sales techniques."). Appellees' First Amendment defense thus fails.

## III. APPELLANTS ADEQUATELY PLEADED THE ESSENTIAL ELEMENTS OF THEIR CLAIMS.

### A. Count I Strict Products Liability Claims were Adequately Pleaded.

#### 1. Reporting Tools Are Products

Appellees argue that Count I fails because reporting tools are not "products" under California law because strict products liability is limited to tangible personal property. AB 38-42. But the relevant inquiry is functional, not formal.

Appellants challenge a mass-distributed, standardized reporting system that Appellees designed, controlled, marketed, and instructed users to employ as a safety mechanism. The alleged defects concern access, categorization, review, response, tracking, and appeal. ER-170-71, 175, 180-81, 184 (AC ¶¶ 67, 73, 94, 112-118, 126-127). Those features operate as a consumer-facing safety system, not as protected expression. Courts applying California law have repeatedly recognized that software-based safety features may be analyzed functionally rather than categorically excluded from products-liability doctrine because they lack physical form. In *In re Uber Technologies, Inc., Passenger Sexual Assault Litigation*, the court held that Uber's mobile application could constitute a product where plaintiffs challenged GPS-related safety features designed to protect users. 745 F. Supp. 3d 869, 905 (N.D. Cal. 2024). The court rejected the argument that the existence of accompanying services defeated products liability, emphasizing that Uber exercised total control over the application's design and placed it into the stream of commerce. *Id.* The court specifically treated safety-oriented software features as the functional equivalent of more traditional product-safety mechanisms.

Likewise, *Hughes v. Apple Inc.* permitted negligence and strict-products-liability claims challenging the adequacy of AirTag safety features to proceed beyond the pleading stage. 723 F. Supp. 3d 693, 707-10 (N.D. Cal. 2024). The

alleged defects included notification systems, warning mechanisms, and other safety features intended to mitigate foreseeable misuse of the product. The court held that questions regarding defect, causation, and preventable danger could not be resolved at the pleading stage. Modern courts confronting software-based safety features have accordingly focused on function rather than tangibility. *See also In re Social Media Adolescent Addiction Personal Injury Products Liability Litigation*, 777 F. Supp. 3d 1016, 1022-23 (N.D. Cal. 2025) (treating platform safety features, parental controls, age-verification measures, account-management tools, and reporting mechanisms as cognizable design features for purposes of product-based negligence claims).

Appellees' proposed tangibility rule is unsupported by the Restatement on which California products-liability doctrine is based. Section 402A applies to "any product" sold in a defective condition that causes physical harm and reaches the consumer without substantial change. Restatement (Second) of Torts § 402A (1965).

Courts in other jurisdictions applying the Second Restatement have likewise rejected categorical exclusions for software-based products. *See, e.g.*, *Garcia v. Character Techs., Inc.*, No. 6:24-cv-1903-ACC-UAM, slip op. at 36 (M.D. Fla. May 21, 2025); *T.V. v. Grindr LLC*, No. 3:22-CV-864-MMH-PDB, 2024 WL 4128796, at *22-23 (M.D. Fla. Aug. 13, 2024).

*Winter* does not help Appellees, as it distinguishes physical products and the ideas and expression contained in a book, explaining that products-liability doctrine is ill-suited to claims challenging information, opinions, and intellectual content. *Winter v. G.P. Putnam's Sons*, 938 F.2d 1033, 1034-36 (9th Cir. 1991). Appellants do not challenge ideas, information, opinions, or expression. They challenge reporting tools are operational systems designed to receive reports, process reports, generate responses, track reports, and provide users with a purported safety mechanism.

Appellees quote *Pierson* for the proposition that the tangibility requirement exists because "[a] defect in the article even if initially latent is ultimately objectively measurable." 216 Cal. App. 3d at 345; AB 41. But the alleged defects here are objectively measurable: Account-gating requirements can be identified, buried interfaces can be tested, tracking and appeal mechanisms can be verified, responses can be measured against Appellees' own human-review decisions. ER-161-62, 175-77, 186-87 (AC ¶¶ 21, 23, 88-98, 136-40). If anything, *Pierson*'s objective-measurability rationale supports treating these reporting tools as product-like safety systems.

Appellees also rely heavily on nonbinding trial-court decisions holding that social-media platforms themselves are not products. *See, e.g., Social Media Cases*, 2023 WL 6847378, at *15; *Jacobs v. Meta Platforms, Inc.*, 2023 WL 2655586, at

*4; *see also Doe 1 v. Meta Platforms, Inc.*, 174 F.4th 1159, 1175 (9th Cir. 2026) (Nelson, J., concurring) (expressing skepticism that Facebook is a "product"); AB 40-42. But Count I does not ask this Court to hold that TikTok, YouTube, or Facebook, viewed in their entirety, are products. It challenges discrete reporting tools and safety features that Appellees designed, distributed, and marketed as mechanisms for reporting harmful content. That defect-specific framing distinguishes the authorities upon which Appellees rely, Appellants do not seek to impose product liability based on feeds, recommendations, content, or social-media platforms as a whole. *See id.* Nor do those authorities address the more specific question presented here: whether a reporting system that Appellees designed, controlled, marketed, and encouraged users to rely upon as a safety mechanism may qualify as a product when the alleged defects concern the system's functional operation.

**2. Appellants Adequately Pleaded Injury and Causation.**

Appellees contend that Count I fails due to lack of physical injury. The district court did not dismiss on that ground; it assumed that Plaintiffs plausibly alleged emotional distress of sufficient severity to satisfy the harm element of a strict-products-liability claim, and dismissed on other grounds. ER-13. Appellees therefore seek affirmance on a ground that the District Court did not adopt.

The Amended Complaint nevertheless alleges physical manifestations of harm. Ms. Doe alleged that she was unable to sleep and was exhausted and tormented. ER-154, 197 (AC ¶¶ 4, 200-01). Ms. McGrath alleged loss of health and physical manifestations of stress and anxiety. ER-172-74 (AC ¶¶ 74-75, 86). Other allegations likewise described stress, anxiety, and physical effects flowing from Appellees' reporting processes. ER-163, 171-74 (AC ¶¶ 33, 74-75, 86). Whether the physical manifestations ultimately satisfy California law is at minimum a fact-intensive question, not a basis for dismissal at the outset. *See Social Media Cases,* 2025 WL 3207660, at *2.

Causation was also adequately pleaded. California's substantial-factor test is broad. The harms alleged here map directly onto the challenged defects in the reporting tools' Representation, Access, and Review-and-Response functions. *See* Opening Br. 28-31 (detailed explanation of harms caused by each defect. The fact that harmful third-party content may also have contributed to those injuries does not defeat causation at the pleading stage. *See Social Media Cases*, 2023 WL 6847378, at *29-30 (holding that causation was adequately pleaded where the complaint alleged that platform design features themselves "cause or contribute to" plaintiffs' injuries and could be found to have caused the alleged harms independent of third-party content).

Appellees' attempt to collapse causation into voluntary exposure to third-party content is futile. But Appellants do not allege injury only from viewing harmful videos. They allege injury from Appellees' own reporting process: Appellees solicited reports, represented that reports would be checked, returned allegedly arbitrary no-violation determinations, provided no meaningful escalation, and later treated the same content differently when it reached Appellees through other channels. ER-175-77, 186-87 (AC ¶¶ 88-98, 136-40). Those allegations plausibly plead that Appellees' product design and misrepresentations were substantial factors in Appellants' injuries.

### B. COUNT II NEGLIGENCE IS PROPERLY ALLEGED

Appellees first argue that Count II is based on the alleged duty to design reporting tools that avoid unreasonable harm was owed to minors, and that such duty is inapplicable here because Appellants are not minors. AB 45. But the Complaint alleges Appellee's duty toward <u>all users</u> including minors. It states: "the Defendants knew, or . . . should have known, that it would pose a serious danger of emotional and physical harm if their purported reporting tool were defective" (AC ¶166)) and that they had a duty to exercise reasonable care in "distributing their product to minors <u>and to protect users.</u>" ER-192-93 (AC ¶¶166, 176-178) (emphasis added). While Appellants represent a putative class that would include minors, the Complaint did not allege that Defendants owed a duty only to minors.

Appellees argue that platforms do not owe a general duty to rescue or an affirmative duty to monitor or remove contents. AB-47-48. Yet, it matters here that Count II's asserts duties specific to the context of avoiding unreasonable harm in maintaining reporting infrastructure, and duties arising from Appellees' voluntary undertaking of the reporting-tool function, over which Appellees exercised exclusive control. ER-193-94 (AC ¶¶ 177-178); *see Doe 1 v. Twitter, Inc.,* 148 F.4th 635, 645 (9th Cir. 2025); *Soc. Media Adolescent Addiction*, 702 F. Supp. 3d at 855. These duties are explained in detail in the Opening Brief. Opening Br. at 33.

Appellees' argument that Appellants voluntarily sought harmful content likewise conflates causation with duty. AB-45. And their contention that emotional harm cannot support the claim ignores the physical harms alleged. ER-163, 171-74 (AC ¶¶ 33, 74-75, 86).

### C. MISREPRESENTATION CLAIMS ARE ADEQUATELY PLEADED

#### 1. Common Law Misrepresentation Claims

i. <u>Actionable</u>

Appellees unpersuasively argue that Plaintiffs' misrepresentation claims are based on non-actionable statements. However, *Grinder*, Appellees' principal authority, does not support this conclusion. In *Grindr*, this Court held that Grindr's promise to maintain a "safe and secure environment for its users" was "too general

to be enforced." *Doe v. Grindr Inc*., 128 F.4th 1148, 1154 (C.A.9 (Cal.), 2025). This Court distinguished Grindr's statements to those in "*Barnes*, 570 F.3d at 1099, [where] a defendant promised to take down indecent profiles impersonating a plaintiff, and in *Estate of Bride*, 112 F.4th at 1173, [where] a defendant promised to unmask the identities of users sending harassing messages" both of which were specific enough to support misrepresentation claims. *Id*.

Here, the statements in Appellee's policies which the District Court erroneously dismissed differ materially from the general promise in *Grindr*. *Id*. The Appellees' policy and guidelines promised specific action: it "would not allow" specific contents that include "asphyxiation" and "any activity that prevents breathing or lead to suffocation," and "content that . . . provides instructions on how to perform a dangerous activity . . . challenges." ER-159-60, 178, 182, 200 (AC ¶¶ 19, 105, 119, 215). Appellees further promised to "enforce these Community Guidelines . . . and apply them to everyone equally . . . regardless of affiliation." ER-160, (AC¶ 19). These are all specific promises concerning Appellees' own conduct and actionable under *Barnes*, *Bride*, and other authorities. *See e.g. Soc. Media Adolescent Addiction,* 702 F. Supp. 3d at 849; *TikTok, Inc. v. Eighth Jud. Dist. Ct. in & for Cnty. of Clark*, 578 P.3d 640, 651 (2025); *State v. TikTok Inc*., 245 N.E.3d at 686–87 (Ind. Ct. App. 2024).

ii. <u>False</u>

Appellees argue that the statements were not false because Appellant Doe was ultimately able to make reports. AB-53. But Doe had to bypass the reporting tool by using a private contact to reach a TikTok representative and demand review of the report. This demonstrates falsity of the promise to review and promise to function equally for all users. ER-161 (AC¶ 24).

Appellees also argue that the reported contents did not violate the guidelines because the videos did not depict choking. AB-54. As explained in Appellants' opposition to Appellees' Motion to Transfer (Dkt No. 39), this argument improperly asks the Court to resolve disputed facts on appeal. In any event, the videos do depict the "space-out challenge" a form of the choking challenge involving self-asphyxiation to induce unconsciousness which demonstrates falsity of Appellees' representations. *Id*.

iii. <u>Reliance</u>

Appellees misstate the record in arguing that Appellants Doe and the Foundation identified no statement on which they relied, and that Bogard and McGrath identify only Statement 3 without pleading "when" they encountered it. The Complaint pleads exposure and reliance with particularity: Bogard and McGrath identified and quoted the specific Policy/Guideline pages they read (ER-169-71 (AC ¶¶ 65, 75, 83)); they allege they were repeatedly exposed to those policies each time they made a report which they did continuously since May 2019

(ER-169-71 (AC ¶¶ 63-65, 71)). The Becca Schmill Foundation likewise alleged that in 2022 it launched a study with researchers who identified and reported videos violating Appellees' "stated policies" to determine whether the reporting tools function as represented. ER-179 (AC ¶ 109). This allegation establishes the timing and manner of exposure to, and reliance on, the policies. *Id*.

Appellant Doe also alleged that on or about May 24, 2022, she contacted a TikTok representative (through a third-party contact, bypassing the reporting tool) and demanded that the TikTok representatives answer whether the videos she reported violated the guidelines. *Id*. AC ¶ 97. This allegation established that Doe had been exposed to the guidelines at this time and relied on them when reporting and contacting TikTok.

That satisfies the specificity requirement under *Kearns* and Rule 9(b) cited by Appellees. *Kearns* involved a plaintiff who failed to identify any statement he had seen, what the allegedly false materials stated, or when he encountered them, depriving the defendant of an opportunity to respond. *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1126 (C.A.9 (Cal.), 2009). Here, by contrast, each Appellant identifies the policies and when they encountered them, quoted them in the Complaint, then pleads reliance, satisfying the pleading standard.

**3. State Statutory Claims**

i. <u>Indiana</u>

Appellees argue that IDCSA claims are insufficient because Appellant Bogard was not "induced" to access the reporting tools, but did so based on "her desire to continue reporting videos." AB-58-59. This improperly distinguishes *State v. Tiktok* where the court held that plaintiffs stated a claim under IDCSA based on the alleged falsity and reliance upon TikTok's Community Guidelines. 245 N.E.3d 681, 696–97 (Ind. Ct. App. 2024). As argued in the opening brief, allegations sufficiently establish inducement. it would defy logic to conclude that the grieving mother (Bogard) would seek out harmful content and make reports for no reason, without inducement by the platforms promise that they would enforce their guidelines through the reporting tool.

Furthermore, Appellees and the lower court erred by concluding that Bogard's damages were limited to emotional distress and therefore could not establish actual damages. AB-59; ER-23.

The IDCSA does not require actual damages, and a plaintiff can instead seek statutory damages of $500. *Hoosier Contractors, LLC v. Gardne*r, 190 N.E.3d 359, 366 (Ind.App., 2022) (holding that the statutory provision allow for action to be brough based on "damages actually suffered as a consumer as a result of the deceptive act or five hundred dollars ($500), whichever is greater" and therefore "if the class carries its burden to show that Hoosier committed incurable deceptive

acts upon which its members relied, its members are entitled to recover statutory damages of $500."); Ind. Code § 24-5-0.5-4(a).

In any event, actual damage was sufficiently alleged here. The district court found that the users' data and engagement "which has value to Defendants" exchanged for users' platform access and reporting tools satisfies the "consumer transaction" requirement (ER-23). Appellants do not challenge this holding. Given the court's unchallenged finding that Bogard's data and engagement had monetary value, together with allegations that Defendants monetize per-use engagement (ER-200 (AC ¶ 215)), and that Bogard did not receive the promised benefit of a functioning reporting tool, she sufficiently pleaded economic damages. *In re Actiq Sales and Marketing Practices Litigation*, 790 F.Supp.2d 313, 324 (E.D. Pa., 2011) (denying defendant's summary judgment motion finding that IDCSA requires "damages as a result of the deceptive act" which is satisfied by Plaintiff's allegation that it potentially suffered monetary damages).

Appellees' invocation of *Huizar* is incomplete. There, the court held that the plaintiff "had not raised a fraud claim" which is why "physical impact" was required beyond "emotional distress" damages. *See Bank v. Huizar*, 178 N.E.3d 326, 341 (Ind.App., 2021) ("Huizar has not raised a fraud claim . . . Huizar has presented no evidence that he experienced a direct physical impact . . . Therefore,

we conclude that Huizar cannot recover emotional distress damages under the DCSA.)

ii. Wisconsin

Appellees argue that Appellant McGrath's WDTPA claim fails because the allegations do not link the misrepresentation to her loss. AB-59. While conceding that the Amended Complaint properly alleges that Ms. McGrath suffered pecuniary losses from time and wages lost to reporting campaigns (ER-174, 201(AC ¶¶ 86, 224)), Appellants argue that this cannot be taken as true the original complaint attributed these losses to grieving her son's death. AB-59-60. Indeed, *Airs Aromatics* bars direct contradiction between the original and amended complaint, but here, Appellant is merely specifying concurrent causes (death of her son, and exhaustion from reporting videos to try to prevent harm to other children) for her work leave and pecuniary losses, which is consistent with her original pleading. *Airs Aromatics, LLC v. Victoria's Secret Stores Brand Management, Inc*., 744 F.3d 595, 600 (C.A.9 (Cal.), 2014).

Furthermore, Appellees cannot invoke a consumer's "voluntary" conduct as a defense false inducement. As explained in the Opening Brief (42, 51-53), YouTube's representations induced McGrath to assume a reporting role (AC ¶ 27) which led her to start reporting the videos. WDTPA requirements have been pleaded.

iii. Oregon

Appellees exploited Appellant Doe's data and engagement, monetizing both for profit. *Pearson* requires an objectively verifiable loss of money or property which is shown here. *Pearson v. Philip Morris, Inc.*, 358 Or. 88, 117, 126 (Or. 2015). The Ninth Circuit has recognized browsing/engagement data carries measurable financial value in *In re Facebook Inc. Internet Tracking Litigation*, 956 F.3d 589, 599-601 (9th Cir. 2020), just as here, Doe's engagement and private data are quantifiable assets monetized on a per-user basis (ER-200, (AC ¶ 215)). While *Facebook Tracking* addressed Article III standing, it provides persuasive guidance on objectively measurable value of user's private data.

Stated differently, Doe's engagement and private data was exchanged for access to Appellees' reporting tool. The Complaint alleges that this data has quantifiable monetary value. ER-200, (AC ¶ 215). Doe alleges that she did not receive what she had bargained for, and therefore is entitled to the monetary value of her private data. *See cf. Clark v. Eddie Bauer LLC*, 371 Or. 177 (Or., 2023) ("purchase price theory" is a viable theory of ascertainable loss). Whether private data constitutes objectively verifiable ascertainable loss of private property should be resolved through discovery, not against Appellants at the pleading stage.

iv. California

Appellees argue that Appellants' "diminution of the value of data" argument should not be considered because it was raised for the first time on appeal. However, that theory derives from the Complaint's allegation that users exchanged data for access and use of the reporting tools (ER-200 (AC ¶215)) and that Appellees monetize users through advertising (ER-204 (AC ¶247)). The diminution of data value is simply another measure of the economic harm arising from that alleged monetization. Thus, this claim should not be subject to forfeiture under *Orr*. *See Orr v. Plumb*, 884 F.3d 923, 932 (9th Cir. 2018).

Moreover, the cited cases may factually vary, they collectively recognize an economic market for users' private data. See e.g. *Brown v. Google,* 2021 WL 6064009, at *17 (sustained both theories Plaintiff-Appellants advance, uncompensated data provision and diminished future property interest, on comparable allegations); contra *Fogelstrom v. Lamps Plus, Inc.*, 195 Cal. App. 4th 986, 994 (2011) (did not plead economic loss and data monetization of personal data).

The Complaint alleges a market in which data is bought for advertising, that Appellants used the Appellees' platforms, and that they paid for the access with the value of their private data. ER-204 (AC ¶247). Further discovery could unveil the full scope of Appellants' economic injury and the relationship between Appellees'

monetization and the data market, to better establish the actual injury for UCL claims. Dismissal was therefore premature.

### D. Proximate Causation

Appellees argue that all harm traces to pre-existing grief plus Plaintiff-Appellants "independent and voluntary decisions" to seek out triggering content, an unforeseeable intervening act breaking the causal chain. AB 66-69. This improperly conflates antecedent events with subsequent harms traced to the reporting tools.

The Complaint alleges that the harms specifically caused by the reporting tools began with Appellees' solicitation and marketing of the tools, which invited users to report harmful content. The causation and harms tied to aspects of reporting tools are explained in detail in the Opening Brief, 28-29, 44.

### E. FOUNDATION ESTABLISHED STANDING

Defendants argue that the Foundation raises a new organizational injury by asserting that Defendant-Appellees' misrepresentations to Congress undermined the Foundation's credibility with lawmakers and forced it to divert resources to fact-checking and corrective research. That mischaracterizes both the complaint and Plaintiff-Appellants' opening brief.

The Foundation has consistently alleged a diversion-of-resources injury. The Amended Complaint alleged that Defendant-Appellees' misrepresentations caused

the Foundation to expend resources conducting independent research, investigating Defendant-Appellees' public claims, and responding to those claims through advocacy. ER-178-79, 182-83, 186-87 (AC ¶¶ 104-109, 119-121, 137-140).

Appellees claim that the Opening Brief introduced a new injury (AB-71) when it merely explained why those diverted expenditures constitute the type of concrete operational harm recognized by *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). BSF specifically pleaded that, because of the misrepresentations, BSF had to engage in research and publication to rebut claims that undercut their credibility. Appellees argue that the expenditures were voluntary research BSF's existing scope. AB 70-71. But the Complaint plainly alleges that Appellees triggered the research: TikTok's October 26, 2021 sworn Senate testimony that the videos "never existed," reports a "hoax," and there was "absolutely no evidence" of violations because they are "remove[d] automatically," (AC ¶ 119) prompted BSF to commission the ACCO study in 2022 specifically to verify and rebut the testimony (AC ¶ 121). YouTube also made parallel representations (AC ¶ 135) prompting the 2022 BSF-ACCO findings (AC ¶ 139). That is compelled diversion under *Havens*: but for the misrepresentations, BSF would have continued its planned KOSA advocacy. *See East Bay Sanctuary*, 993 F.3d at 663-64.

## CONCLUSION

For reasons argued above, this Court should reverse and remand.

Date: August 17, 2026

/s/Juyoun Han
EISENBERG & BAUM, LLP
24 Union Square East, Penthouse
New York, New York 10003
917 935-0251
*jhan@eandblaw.com*
*Attorney for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

I certify that:

This brief complies with the word limit of Ninth Circuit Rule 32-1 because this brief contains 6,939 words, including words manually counted in any visual images, and excluding the items exempted by Fed. R. App. P. 32(f).

This brief complies with the type size and typeface requirements of Fed. R. App. P. 32(a)(5) and (6).

Date: August 17, 2026

/s/ Juyoun Han
EISENBERG & BAUM, LLP
24 Union Square East, Penthouse
New York, New York 10003
917 935-0251
*jhan@eandblaw.com*
*Attorney for Plaintiffs-Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that on [insert date], I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the Appellate Electronic Filing system.

Date: August 17, 2026

/s/Juyoun Han
EISENBERG & BAUM, LLP
24 Union Square East, Penthouse
New York, New York 10003
917 935-0251
*jhan@eandblaw.com*
*Attorney for Plaintiffs-Appellants*